## In re HOLOCAUST VICTIM ASSETS LITIGATION.

### Case No. CV 96–4849(ERK)(MDG).

United States District Court,
E.D. New York.

Nov. 4, 2002.

Sid Wolinsky, Disability Rights Advocates, Oakland, CA, for Disability Rights Advocates.

Harry Reicher, New York City, for Director of International Affairs and Representative of the United Nations of Agudath Israel World Organization.

Judah Gribetz, Richard & O'Neil, PC, New York City, Pro se.

Burt Neuborne, New York University Law School, New York City, Richard D. Emery, Emery, Cuti, Brinckerhoff & Abady, PC, for Jacob Friedman.

Jean M. Geoppinger, Paul M. DeMarco, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Co., LPA, Cincinnati, OH, Mel Urbach, Jersey City, NJ, for The World Jewish Organization.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, William Schwartz, Cadwalader, Wickersham, Taft, LLP, New York City, for South Florida Holocaust Survivors Coalition and Thomas Weiss.

Juanita A. Crowley, Max O. Truitt, Roger M. Witten, Wilmer, Cutler & Pickering, Washington, DC, Anthony L. Paccione, Hertzog, Calamari & Gleason, New York City, for Union Bank of Switzerland, Swiss Bank Corp., Banking Institutions # 1–100, John Does # 1–100, Certain Swiss Bank Accounts, and Bank of International Settlements.

## CORRECTED MEMORANDUM AND ORDER

KORMAN, Chief Judge.

On behalf of Kohn Swift & Graf, P.C., Robert A. Swift has applied for counsel fees for his role in the litigation that led to the settlement of the class action. While others have joined in his application, I address here Mr. Swift's application and one issue that is common to the others. The background of the case is set forth in *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139 (E.D.N.Y.2000). The fee application proceedings here and the determination of the appropriate fees are both unique to class action cases. Only recently, Judge McLaughlin wrote that "the adversary system is typically diluted-indeed, suspended-during fee proceedings." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir.2000). The suspension of the adversary system results from the disinterest of the defendants once the case has been settled and "the incentives for collusion-the temptation for the lawyers to agree to a less than optimal settlement 'in exchange for red-carpet treatment on fees.'" *Id.* at 53 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991)). Moreover, "the class members have no real incentive to mount a challenge that would result in only a 'minuscule' pro rata gain from a fee reduction." *Id.* at 53 (quoting *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 573 (7th Cir.1992)).

This case is different from other cases because some of the leading members of the class action bar agreed to prosecute the case without fee, thus altering the considerations that typically underlie the determination of an appropriate fee. Moreover, one of them, Professor Burt Neuborne, has undertaken to carefully review the fee applications of those attorneys who provided services and seek fees. The net result is the introduction of the adversary process into this fee proceeding. In various declarations he has filed, Professor Neuborne has evaluated the services rendered by those attorneys who seek legal fees. However, he has argued that none of the attorneys be compensated for the risk in assuming representation because the class had available to it the services of "the cream of the profession." *Goldberger,* 209 F.3d at 55 (quoting *In re Michael Milken & Assocs. Sec. Litig.*, MDL No. 924, 1993 WL 413673, at *9 (S.D.N.Y. Oct.7, 1993)). Under these circumstances "a fully informed group of plaintiffs able to negotiate collectively" *would not have* bargained for a risk multiplier or agreed to pay attorneys fees based on a percentage of the amount recovered.

Mr. Swift and others who seek substantial fees for time expended on behalf of the class, and who seek a risk adjusted multiplier on top of those fees, move to strike Professor Neuborne's declarations. ("Motion to Strike"). I address this motion first and I then turn to the issue of Mr. Swift's request for a risk adjusted multiplier. I begin by observing that Professor Neuborne's position regarding the award of an enhancement for risk is a legal argument; although made by an expert in the field, I do not treat it as a form of expert

testimony. By contrast, his opinion of the contribution that individual attorneys made and the reasonableness of their lodestar calculation is a form of expert testimony.

■ Mr. Swift first argues that Professor Neuborne is a lay witness who lacked personal knowledge of the work of the attorneys, Fed.R.Evid. 701, and that he cannot offer expert testimony here. This contention is directly contradicted by Professor Neuborne, who states that he has "personally observed the efforts of counsel throughout these proceedings, and make this declaration concerning attorneys fees on the basis of personal knowledge." (Declaration at ¶ 2). Indeed, Professor Neuborne was a founding member of the Plaintiff's Executive Committee where he was the glue that held it together, and he was intimately involved in every significant aspect of the case. After the preliminary approval of the proposed settlement and the provisional certification of the class, he was designated lead plaintiffs' counsel. Moreover, a number of cases recognize that some lay witnesses are qualified to give a conclusion based on personal experience with documentary or physical materials. *See Eisenberg v. Gagnon,* 766 F.2d 770, 781 (3d Cir.1985) (approving testimony by lawyer on what he thought should be in private offering memoranda and whether memorandum complied with disclosure requirements; lay testimony was proper because lawyer "personally observed the preparation of the offering memoranda and scrutinized them for adequacy of disclosure"); *Soden v. Freightliner Corp.,* 714 F.2d 498, 510–12 (5th Cir.1983) (service manager in charge of maintenance of trucks allowed to give opinion as to defect and its dangerousness); *United States v. Grote,* 632 F.2d 387, 390 (5th Cir.1980) (IRS agent could give opinion as to whether tax returns filed were acceptable or not). Confronted with an analogous situation in *Eisenberg,* the Third Circuit per-

mitted an attorney lay witness to evaluate the quality of another attorney's work product because the witness had observed the preparation of the documents, carefully examined them, and possessed the requisite qualifications and experience to be able to draw conclusions from them. Similarly, Professor Neuborne carefully examined the work product and billing records of the attorneys in this case and because of his personal observations is more than qualified to render an opinion as to their relative quality and importance to the litigation.

■ More significantly, Professor Neuborne may properly be considered an expert, in which case his opinion is admissible even without personal knowledge. *See* Fed.R.Evid. 703. The standard for expert testimony requires that the witness be qualified as an expert and that the testimony be helpful to the trier of fact. *See* Fed.R.Evid. 702. Experienced practitioners can be deemed experts in their field of practice, and may render opinions on the competence and value of services performed by other practitioners. *See, e.g., Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1851, n. 4, 152 L.Ed.2d 914 (2002) (finding that defendant's ineffective assistance of counsel claim was undermined because two attorneys with "extensive experience in prosecuting and defending criminal cases" testified as expert witnesses and found that defendant's attorney was "fully capable" and "extremely experienced"); *Benjamin v. Kerik,* 2000 WL 278085, *1, 2000 U.S. Dist. LEXIS 3036, *2 (S.D.N.Y. Mar. 14, 2000) (finding that attorney who was "seasoned practitioner" could testify as an expert on the importance of criminal defense attorney access to pre-trial detainees); *R.B. Venture, Ltd. v. Shane,* 2000 WL 520615, *5, 2000 U.S. Dist. LEXIS 5631, *15–16 (S.D.N.Y. May 1, 2000) (finding that experienced real es-

tate broker could testify as an expert on the reasonable value of another broker's services). Indeed, at least one case has held that testimonial evidence from practitioners is the best measure of what constitutes a reasonable hourly rate for attorneys fees. *See McNeill v. Secretary of Health and Human Services,* 713 F.Supp. 59, 60–61 (W.D.N.Y.1989).

Professor Neuborne possesses a wealth of academic expertise and practical experience in class action cases. He is the John Norton Pomeroy Professor of Law at New York University School of Law, where he has taught Civil Procedure for 28 years. Class actions play a significant role in his Civil Procedure curriculum. In connection with his teaching responsibilities, he has, for the past 28 years, read widely and systematically in the case law and secondary literature on class actions. He is familiar with all major cases developing class action doctrine, and has taught the subject repeatedly. In addition, in his capacity as a member of NYU Law School Personnel Committee for seventeen years, he has closely considered the work of numerous scholars who have written in the class action area in connection with its evaluation of their possible status as faculty members. Professor Neuborne believes that he has read every major secondary article on class actions.

Professor Neuborne's academic knowledge of the class action area is supplemented by extensive practical experience in class action litigation. He served on the legal staff of the American Civil Liberties Union for eleven years, during which time he participated in numerous class actions involving employment discrimination, prison reform, public school desegregation, foster care, and political discrimination. From 1982–86, he served as National Legal Director of the ACLU. His duties included supervising literally dozens of class

actions pending throughout the United States.

The following selected examples illustrate the breadth of his class action experience. On July 15, 1977, Professor Neuborne was appointed by Chief Judge Jacob Mishler as counsel for the plaintiff-class in *Cullen v. Margiotta,* 76 Civ. 2247, 0088 WL 1026595 (E.D.N.Y.), a Rule 23(b)(1) and (3) class action challenging coercive political fund raising practices in Nassau County. Judge Mishler's order appointing him states:

> ... after soliciting and receiving suggestions for appointment from the named plaintiffs' attorney, the Federal Bar Council and the Federal Courts Committee of the Association of the Bar of the City of New York, we appointed Mr. Burt Neuborne to represent the absentee members of the class. Mr. Neuborne is a professor of Law at New York University School of Law, where he teaches courses involving the federal courts, and federal civil procedure and constitutional litigation. As former assistant legal director of the American Civil Liberties Union and former staff counsel to the New York Civil Liberties Union, he has an extensive background in federal civil rights litigation ... There is no question that, in conjunction with the named plaintiffs' attorney, he will ably and effectively represent the interests of the class.

*Cullen v. New York State Civil Service Com.,* 435 F.Supp. 546, 564 (E.D.N.Y. 1977).

Professor Neuborne writes that, as court-appointed counsel for the plaintiff class, he litigated *Cullen v. Margiotta* for almost fourteen years. The class action issues raised in the case were extremely difficult, ranging from the definition of the class, to notice, to opt-out rights, to complex issues raised at the remedial stage.

Professor Neuborne tried *Cullen* before a jury in a trial that lasted six weeks, and won the first jury verdict granting RICO treble civil damages. Moreover, he developed and administered a complicated remedial scheme that resulted in the refund of more than one million dollars to individual members of the plaintiff class, constituting three dollars for every dollar contributed. The class action judgment was successfully defended in the Second Circuit and in the United States Supreme Court.

Set forth below in Professor Neuborne's own words are other examples of his practical experience as a class action lawyer:

A second example of my practical experience in the class action area was my role in negotiating and implementing the class action settlement in *Wilder v. Bernstein*, 73 Civ. 2644 (S.D.N.Y.), an extremely complex class action challenging the foster care practices of the City of New York. In my capacity as National Legal Director of the ACLU, I supervised the later phases of the *Wilder* litigation, and played a major role in negotiating a complex consent decree designed to restructure the City's foster care system. The case, brought on behalf of a class of minors, involved virtually every possible class action issue. I joined with F.A.O Schwarz, Jr., who had represented New York City in the *Wilder* case, in co-authoring a dialogue on the settlement of complex class actions. Burt Neuborne & Frederick A.O. Schwarz, *Consent Decrees: Practical Problems and Legal Dilemmas,* 1987 University of Chicago Law Forum 177; 235.

A third example of my hands-on involvement in class action litigation was my work as lead counsel for a nationwide class of small farmers who sought relief against farm foreclosure proceedings brought by the Farmers Home Administration. See *Coleman v. Block,* 562

F.Supp. 1353 (D.N.D.1983). I argued the *Coleman* case in the District of North Dakota, and won a nationwide injunction preventing foreclosure proceedings against thousands of small farmers. The *Coleman* case began as an individual action, evolved into a statewide class action, and culminated in a nationwide class action, with exceptions for several states where individual litigation was already pending. The case raised extremely difficult class action issues.

A fourth example of my involvement in complex class action litigation was my role in the *Stieberger* case, a class action challenge to the "non-acquiescence" policy adopted by the Social Security Administration. See *Stieberger v. Heckler,* 615 F.Supp. 1315 (S.D.N.Y.1985), vacated sub nom. *Stieberger v. Bowen,* 801 F.2d 29 (2d Cir.1986). *Stieberger* was a class action challenge to the policy of intra-circuit non-acquiescence in Circuit precedent adopted by the Social Security Administration in 1981. I argued the case in the District Court and secured an injunction against the practice. The Social Security Administration withdrew the policy during the pendency of the appeal, which I argued in the Second Circuit. The litigation raised extremely complex class action issues, including notice, opt–out, and the relationship between class action, preclusion and *stare decisis.* See Burt Neuborne, *The Binding Effect of Supreme Court Precedent* 61 Tulane L.Rev. 991 (1987).

Yet a fifth example of my role in the class action area was my work in the early 1970's in the *Alsager* litigation, a complex class action challenge to the parental termination standards and procedures used in Iowa. The class action issues in *Alsager* were particularly complex because the case was on the jurisdictional line between habeas corpus and

42 U.S.C. § 1983. I successfully briefed and argued the procedural aspects of the case in the District of Iowa.

Finally, my career includes numerous First Amendment cases involving free speech, free exercise of religion, and political participation. I estimate that at least twenty First Amendment cases were brought as class actions.

Professor Neuborne explains that in making his assessment of the relative value of the legal services provided to the plaintiff class in the Swiss bank litigation he drew on a considerable body of experience gained over 38 years of active civil rights/civil liberties litigation, often in the context of class actions:

> During my years of service as Legal Director of the ACLU, I had no choice but to make repeated judgments about the relative value of the legal services provided by literally hundreds of lawyers on pending ACLU cases. I was forced to make such judgments in the context of employment decisions, the allocation of scarce legal resources, and the award of attorneys fees under 42 U.S.C. § 1988. While the final decision is, of course, within the informed discretion of the District Court, I am confident that my assessment of the value of the services rendered to the plaintiff class herein by various lawyers was based on my years of academic and practical experience in the class action area.

Professor Neuborne's extraordinary experience, his familiarity with the attorneys in this case, the nature of the work performed, and the insights he possesses from his integral role in the litigation from its inception make his opinion as to the importance of each attorney's contribution particularly helpful. Indeed, he brings far more expertise to his task than a special master without direct knowledge. *See, e.g., Goldberger,* 209 F.3d at 56 (where special master made fee recommendation based in part on "his own experience as a practitioner").

■ Mr. Swift also protests that Professor Neuborne's recommendation is "a final conclusion which is the Court's sole province." Motion to Strike at 4. This contention has little merit. Federal Rule of Evidence 704(a) explicitly provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." While I am not bound by Professor Neuborne's opinion, it is not inadmissible because it "embraces an ultimate issue to be decided by the trier of fact."

■ More significantly, like Professor Neuborne, I find it difficult to understand the factual objections raised by Mr. Swift to Professor Neuborne's generous assessment of his work which includes a recommendation that Mr. Swift's lodestar be enhanced because of the quality of his work. As Professor Neuborne has written:

> I recommended full payment of Mr. Swift's time charges, plus a modest multiplier for excellence. I opposed his request for a significant multiplier keyed to risk because, under the unique circumstance of this case, no risk multiplier is appropriate. In my opinion, no reasonable class would have bargained for a risk multiplier in a setting where, as here, highly competent counsel were prepared to undertake the litigation on a *pro bono* basis. The issue, therefore, is not the value of Mr. Swift's work-I recommend full compensation for time expended-but whether, as a matter of law, any counsel is entitled to a risk multiplier in this case. Since the very purpose of a risk multiplier is to act as an inducement to counsel to take a case that otherwise might not have been undertaken, and since this case would clearly have been undertaken on a *pro bono*

basis by highly competent counsel without the need for a risk multiplier, it follows that under prevailing law no risk multiplier should be paid to any counsel herein.

Indeed, it is possible to view Mr. Swift's legal work as essentially duplicative of the work performed by *pro bono* lawyers, rendering any award of fees to him highly questionable. I believed, however, that such an approach would be unduly harsh. Accordingly, I recommended that all counsel, including Mr. Swift, receive a fee award that reflects time actually expended that actually advanced the interests of the plaintiff class. I continue to believe, however, that it would constitute an undeserved windfall to pay significant risk multipliers to any counsel herein.

I find Professor Neuborne's argument regarding a risk adjusted enhancement of the lodestar to be compelling. I reject Mr. Swift's request, and those of others who join his application, that .96% of the settlement ($12 million) be divided among them (amounting to a multiplier of 2.29 to their base lodestar calculation) to compensate them for the risk they undertook.

First, I reject Mr. Swift's claim that "[t]he judges in the Eastern District of New York adopted a *Civil Justice Expense and Delay Reduction Plan*, effective December 17, 1991, which provides, *inter alia*, that attorneys' fees in common fund cases shall be based on a percentage of the recovery but that in cases settling after significant time has been expended, lodestar information shall serve as a guideline." Robert Swift Memorandum in Support of Fee Application at 6 ("Swift Memorandum").

The Civil Justice Expense and Delay Reduction Plan ("CJRA Plan") expired on July 31, 1996, and the specific provision relating to compensation in common fund cases was not included in the Local Rules

that were subsequently adopted on April 15, 1997. *See* Local Civil Rule 23.1. Moreover, judging by the fee applications, this case settled "after significant time has been expended." Finally, the CJRA Plan expressly provided that, "[f]or cause shown, any judicial officer may in any case modify or suspend the operation of any one or more or all the provisions of this Plan." CJRA Plan at page 1.

In addition, the Second Circuit recently held that the choice between awarding a percentage of recovery fee or the lodestar amount with or without modifiers is within the sound discretion of the district court. *See Goldberger*, 209 F.3d at 50. In affirming a fee based on the lodestar and rejecting an argument for a percentage award, Judge McLaughlin wrote: "[W]e adhere to our prior practice that a fee award should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund." *Id.* at 53 (internal citations and quotation marks omitted). I follow that practice here in rejecting Mr. Swift's claim that a percentage multiplier or a particular percentage be awarded here.

While a contingent risk may sometimes justify an award in a class action case higher, and perhaps much higher, than what the attorney would receive in hourly billing for the same case, the unique circumstances of this case make such an award inappropriate here. Simply stated, viewing the matter *ex ante*, this class action did not require a contingent fee arrangement because Melvin Weiss and Michael Hausfeld, two of the most highly regarded and able class action lawyers in the United States were prepared to prosecute it without fee. Indeed, Mr. Weiss was one of those described by Judge Pollack as " 'the cream of the profession' " whose " 'genius and dedication were vital

in resolving the complexities of the [Drexel] litigation.'" *Goldberger,* 209 F.3d at 55 (quoting *In re Michael Milken & Assocs. Sec. Litig.,* MDL No. 924, 1993 WL 413673, at *9 (S.D.N.Y. Oct.7, 1993)). Professor Neuborne, who contributed immeasurably to the successful settlement also agreed to work without fee. While Mr. Neuborne has extensive experience in class action litigation, which I have already described, I hesitate to call him a class action lawyer only because the breadth of his knowledge and experience extends beyond that limited specialty. Moreover, other extraordinarily able counsel who sought fees were apparently willing to seek compensation only for time expended.

In sum, the existence of competent *pro bono* counsel make a risk multiplier inappropriate in this case because market inducement was not required to attract dedicated attorneys. Nor would a reasonable client have agreed to a fee based on a percentage of the recovery to those attorneys seeking to be paid for their services. Indeed, it is arguable whether such a client would have agreed to pay any fee. *See Goldberger,* 209 F.3d at 52 (rejecting proposed percentage fee because "we question whether a fully informed group of plaintiffs able to negotiate collectively" would have agreed to such an amount).

Mr. Swift questions "[w]hether *pro bono* counsel had experience in the prosecution or trial of human rights litigation such that they would have carried on the litigation successfully without other counsel." Letter Dated September 10, 2002. Mr. Swift apparently alludes to his experience in representing one set of victims suing Ferdinand Marcos for torture committed in the Philippines during the Marcos dictatorship and other similar cases. *See In re Marcos Human Rights Litigation,* 103 F.3d 767 (9th Cir.1996). This argument is frivolous.

This case and cases like the *Marcos* litigation have little to do with each other. The heart of this case and the only cause of action capable of surviving a motion to dismiss turned on the failure of Swiss banks to honor their contractual and fiduciary duties to their depositors. *In re Holocaust Victim Assets Litigation,* 14 Fed.Appx. 132, 135 (2d Cir.2001). The other claims against the Swiss banks, while not without a moral basis, were not sustainable, *id.,* and had little in common with the claims of torture against Ferdinand Marcos, other than the jurisdictional statute they invoked. Thus, Mr. Swift's suggestion that this case could not have been successfully prosecuted without an attorney who litigated the *Marcos* torture case or other similar cases borders on the absurd.

Mr. Swift also suggests that *pro bono* counsel are not reliable because they "frequently have objectives or priorities other than clients' interests and priorities," while contingency fee attorneys have an alignment of interests with their clients. Motion to Strike at 7. Instead, he argues that "[t]he American experience in class action cases is that an alignment of counsel's professional and pecuniary interests best serves clients and the court system." *Id.* This stands the "American experience in class action cases" on its head. As the Second Circuit has observed, the routine award of percentage contingency fees has "tended to yield too little for the client-class, and an unjustified 'golden harvest of fees' for the lawyer." *Goldberger,* 209 F.3d at 48, (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468–69 (2d Cir.1974) ("*Grinnell I*")). Indeed, the formulation and widespread adoption of the lodestar method was a direct response to the perceived abuses and over-compensation of attorneys, and the recognition that "not every lawyer will fairly subordinate his own commercial interests to those of

his client." *Goldberger,* 209 F.3d at 48. Thus, the Second Circuit's constant refrain urges moderation and the avoidance of "windfall fees." *Grinnell I,* 495 F.2d at 462–63.

More significantly, the entire settlement approval process proceeds on an inherent distrust of class action attorneys who expect to be paid a percentage of the settlement. "In a class action, the principal impediment to assuring an untainted settlement process is the financial interest of counsel, who may be improperly influenced to accept certain settlement terms, or to accept a settlement at all, thereby 'subordinating the interests of class members to the attorney's own economic self-interest.' " *In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d 139, 146 (E.D.N.Y. 2000) (quoting John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 Colum. L.Rev. 370, 371–72 (2000)). In approving the settlement in this case, I concluded that "such a 'divided loyalty' structural concern is absent from this case" for the following reason:

> Key members of the plaintiffs' Executive Committee who negotiated this settlement are providing their services on a pro bono basis, at most requesting that, in lieu of attorneys' fees, payments be made to law schools to endow Holocaust Remembrance Chairs in honor of class members who did not survive, and to foster international human rights law designed to prevent similar human tragedies in the future. [Neuborne Decl. I ¶ 28.] Numerous lawyers, including plaintiffs' lead settlement counsel, have waived all attorneys' fees. Those relatively few members of the plaintiffs' Executive Committee who are seeking fees personally have agreed to limit their fee applications to the traditional "civil rights" standard of lodestar for time actually expended that materially advances the litigation, and all fees are

capped at no more than 1.8% of the settlement fund, with discretion to award a lower sum. *Id.*

*Holocaust Victim Assets Litigation,* 105 F.Supp.2d at 146.

While there is a substantial body of law and academic writing reflecting the concerns raised above with the compensation of class action lawyers, my own experience with *pro bono* attorneys is that they are extraordinarily devoted to the interests of their clients and represent them with great skill. Indeed, this was clearly the case here.

Moreover, the justification for an enhancement for risk here is also undermined by other factors aside from the decisive one discussed above. The issue of accepting the services of counsel who sought to be paid, when others were prepared to provide their services without compensation, was challenged from the outset. Those attorneys who provided services necessarily took the risk that the fee structure would be adjusted to reflect the willingness of the "cream of the profession" to appear *pro bono.* More significantly, this case had been widely recognized as a catalyst for subsequent cases, including a $5 billion settlement of litigation on behalf of victims of Nazi slave and forced labor. *Holocaust Assets Lit.,* 105 F.Supp.2d at 148. As Professor Bazyler has observed:

> This remains the most important legacy of the Swiss banks litigation. Not only did the litigation yield an over U.S. $1 billion settlement payout from the Swiss banks, but also opened the floodgates for all the Holocaust restitution settlements to follow. Surely, if the campaign against the Swiss had failed, the holocaust restitution movement would have gone nowhere. Success against the Swiss banks emboldened lawyers, politicians, and Jewish activists

in the United States to take on other corporations which had profited from the miseries of the Holocaust victims. In a very real sense, therefore, the Swiss bank settlement can be called the mother of all Holocaust restitution settlements, yielding not only the U.S. $1.25 billion from the Swiss banks, but also leading to an additional $7 billion being called for other restitution claims. Michael J. Bazyler, *www.swissbankclaims.com: The Legality and Morality of the Holocaust–Era Settlement with the Swiss Banks,* 25 FORDHAM INT'L L.J. S–64, S–87 (2001).

Mr. Swift and other lawyers in the Swiss bank litigation received millions of dollars in fees for their work in the cases that followed. Indeed, Mr. Swift reportedly received a fee of $3.5 million from the settlement of the German Slave Labor litigation. The multiplier was "confidential." *See* Daniel Wise, *Lawyers Get $60 Million in Fees for Holocaust Settlement,* N.Y. Law Journal, June 14, 2001. Mr. Swift has himself described the Swiss bank litigation case as a "loss leader" for those attorneys who provided their services without fee. Letter of Robert Swift dated September 10, 2002, at p. 2. Of course, it will be a "profit leader" for him, because he will be reimbursed for all of the time he expended enhanced by an excellence award recommended by Professor Neuborne.

Finally, the deposited assets aspect of the case, which drove the ultimate settlement, had substantial legal merit, and discovery which would have involved an enormous expenditure of time and effort was undertaken by the Volcker Commission and the Bergier Commission. Indeed, discovery was stayed from the inception of the case and a substantial part of the work of counsel involved participation in failed settlement negotiations which began four months after the case was filed and ended in July 1998 "when this Court resuscitated the talks." Swift Memorandum at 6. While the amount of the settlement may have been uncertain, it was not difficult to foresee a settlement that would have compensated counsel for the time they expended. Indeed, the army of lawyers who were ready to appear in this case with the expectation of a fee confirms this assessment.

I now turn to the question of what is an appropriate fee for Mr. Swift. The Second Circuit has repeatedly urged moderation in awarding class-action attorneys' fees. The ultimate goal is to provide reasonable compensation, not to bestow a windfall on plaintiffs' counsel. *See Goldberger,* 209 F.3d at 48, 53; *Grinnell I,* 495 F.2d at 469–71; *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977) ("*Grinnell II* "). Professor Neuborne's recommendation is consistent with these holdings. In recommending that Mr. Swift be paid for the full amount of his lodestar calculation, Professor Neuborne notes that "the time charges submitted by Mr. Swift in connection with his fee applications" were "well within the range of reasonable staffing" and were in fact "quite modest." Although he rejected Mr. Swift's requested risk multiplier, Professor Neuborne did conclude that because Mr. Swift served as co-chair of plaintiff's Executive Committee, served as an informal liaison with Deputy Secretary Stuart Eizenstat, and was involved in every aspect of the litigation, "a modest excellence multiplier is warranted for Mr. Swift's personal contribution."

Professor Neuborne, as he explained in a conference call with Mr. Swift, felt that the initial lodestar request of $783,000 did not adequately reflect Mr. Swift's contribution to the case and the number he chose brought it up to $1,125,000. When he made his initial recommendation, Professor Neuborne overlooked a supplemental

application by Mr. Swift for time expended since the filing of the initial fee application. *See* Third Supplemental Neuborne Declaration ¶ 5. The supplemental fee application brings the lodestar up to $854,422, through November 20, 2000. Mr. Swift declined to seek fees for time expended after that date, which he described as "modest." Nor was compensation sought for $29,475.00 Kohn Swift & Graf paid to student interns.

The $1.125 sum recommended by Professor Neuborne constitutes an effective excellence multiplier of 1.32. I accept Professor Neuborne's recommendation with considerable hesitation. In *Blum v. Stenson*, 465 U.S. 886, 898–99, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court held that "the quality of representation . . . may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged *and* that the success was exceptional." (internal citations omitted). *Accord Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)(emphasis added). Mr. Swift's application did not offer "specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged [$385.000 for Mr. Swift]." *Blum*, 465 U.S. at 899, 104 S.Ct. 1541 (internal citations omitted). Moreover, the $1.25 billion settlement was due to the quality of the work of a number of lawyers, some of the best of whom were working without fee, as well as other factors that finally broke down the stonewall that the Swiss banks had erected to obstruct those seeking monies that were deposited by victims of Nazi persecution and never repaid. As Professor Bazyler has written:

> [A] number of political factors came into the picture, all of which had the effect of putting added pressure on the Swiss banks in addition to the litigation. First, beginning in April 1996, the U.S. Senate Banking Committee, headed by Senator Alfonse D'Amato, held hearings on the issue. Second, a number of state and local governments threatened to stop doing business with the Swiss banks unless they settled the claims. Third, in May 1997, the United States government issued a report, written by then-Undersecretary of State Stuart Eizenstat (and later Deputy Treasury Secretary and Special Representative of the President and the Secretary of State for Holocaust Issues) sharply criticizing the Swiss for their World War II dealings with the Nazis. Finally, UBS, now undergoing a merger with co-defendant Swiss Bank Corporation, was caught attempting to shred World War II-era financial documents, in violation of a newly-enacted Swiss law forbidding such actions.

Michael J. Bazyler, *The Holocaust Restitution Movement in Comparative Perspective*, 20 BERKELEY J. INT'L L. 11, 15 (2002).

While I quote Professor Bazyler's concise summary, his account is consistent with my own discussion with the parties during the settlement negotiations. More significantly, once the Swiss stonewall crumbled, the final negotiations in which I participated intimately were crucial in determining the amount of the settlement. Messrs. Weiss, Hausfeld & Neuborne were unyielding in their insistence on a $1.5 billion settlement. While Mr. Swift was a voice of moderation, it was their keen understanding of how far the envelope could be pushed that persuaded me that it would take $1.25 billion to settle the case. This sum was close enough both to the amount plaintiffs demanded and an amount suggested to defendants that was not rejected out of hand. I recommended

it after calculating that neither side could reject it.

Yet another factor cautioning against a significant excellence multiplier for Mr. Swift is that a considerable part of the hours expended by him and others occurred after the agreement was reached. In the case of Mr. Swift, almost 40% of the lodestar (1,042 hours out of a total of 2,716.60) is comprised of time expended after the case settled on August 13, 1998. This work is more than adequately compensated by the hourly rates billed by Mr. Swift and his associates. The truly outstanding post-settlement work that benefitted the Settlement Fund and its beneficiaries by millions of dollars was that of Mel Weiss. After Special Master Judah Gribetz called attention to the diminution of the Settlement Fund by taxes on earned interest as well as the taxation of benefits awarded to the members of the classes, Mr. Weiss was instrumental in leading the effort to persuade Congress to adopt legislation exempting from taxation interest earned by the Settlement Fund and payments to its beneficiaries.

■■■ The $1.125 million recommended by Professor Neuborne constitutes an effective multiplier of 1.554 of the lodestar that led up to the settlement—an hourly rate of almost $600 for Mr. Swift and an hourly rate enhanced comparably for members of his firm. Under the circumstances of this case such an award seems overly generous. *See, e.g., Goldberger,* 209 F.3d at 51–56 (no multiplier); *In re Dreyfus Aggressive Growth Mutual Fund Litig.,* 2001 WL 709262, 2001 U.S. Dist. LEXIS 8418 (S.D.N.Y. June 22, 2001) (refusing to apply 2.03 multiplier); *In re Auction Houses,* 2001 WL 170792, 2001 U.S. Dist. LEXIS 1989 (S.D.N.Y. Feb. 23, 2001) (no multiplier); *Varljen v. H.J. Meyers & Co.,* 2000 WL 1683656, 2000 U.S. Dist. LEXIS 16205 (S.D.N.Y. Nov. 8, 2000) (refusing to apply 1.6 multiplier); *Berlinsky*

*v. Compagnie Generale D'Electricite,* 970 F.Supp. 348 (S.D.N.Y.1997) (reducing proposed 2.97 multiplier to 1.4). Nevertheless, because of Professor Neuborne's intimate familiarity with the case, I accept his assessment that it accurately reflects Mr. Swift's contribution to the result. I refuse to award interest for delay in making the award because any loss of interest is more than compensated for by the generosity of the award, because the lodestar is based on current hourly rates, *see* Swift Memorandum at 14 n. 8; *Savoie v. Merchants Bank,* 166 F.3d 456 (2d Cir.1999); *Grant v. Bethlehem Steel Corp.,* 973 F.2d 96 (2d Cir.1992), and because Mr. Swift's lodestar was accepted without the "gimlet-eyed review of line-item fee audits," which counsel in other lodestar cases have been put through. *Goldberger,* 209 F.3d at 49–50.

\* \* \* \*

On September 25, 2002, Mr. Swift wrote a letter that is one of the most bizarre papers he has filed related to the fee determination. The letter followed a submission by Mr. Neuborne detailing his experience in class action cases. I had asked Mr. Neuborne to submit such a letter because of Mr. Swift's claim that Mr. Neuborne was not an expert.

After a frivolous and pointless attack on Professor Neuborne, Mr. Swift felt the need to express his fear "that fair action will not be taken on this firm's fee application" because he is the only prominent attorney in the case who is not Jewish. Mr. Swift's letter continues as follows:

> When I was attacked as being an anti-semite by Ms. Geoppinger in correspondence to this Court, the Court did nothing. I do not believe that a federal court can allow religious and ethnic slurs to go unchallenged. If the Holocaust—which this case is about—teaches nothing else, it is that good people cannot fail to act in the face of ethnic and religious attacks. I was personally offended that

the Court, knowing of my unique background in representing not only Jews but persons of all religious persuasions worldwide, did nothing.

This allegation, which formed the basis for a suggestion that I recuse myself, is beyond the pale. I begin first with the factually inaccurate claim that I remained silent when Mr. Swift was attacked as an anti-Semite. This allegation has its basis in an exchange of correspondence between Mr. Swift and Jean M. Geoppinger, an attorney representing the Claims Conference—an agency which is involved in the distribution of the Settlement Fund. On March 9, 2001, Mr. Swift wrote a letter suggesting the appointment of a watchdog to oversee the work of the Claims Conference. Specifically, he recommended "the employment of an accountant from a medium-sized accounting firm in New York who can visit the offices of the Claims Conference three times a week ... to assure the Court and legal counsel that the settlement fund is being spent wisely and the work is being done protectively." Mr. Swift concluded this suggestion by observing that, "*since the Claims Conference is a Jewish NGO, the accountant should not be Jewish.*" (emphasis added).

This suggestion that I should enter an order excluding Jews from consideration for the position of a court appointed watchdog to oversee the Claims Conference, which implied that a Jewish accountant could not be trusted, would be offensive coming from any attorney; it was particularly insensitive coming from an attorney for a class composed of survivors of Nazi persecution. Ms. Geoppinger replied that she would not dignify with a response Mr. Swift's "offensive and insulting suggestion." She did not call Mr. Swift an anti-Semite. If anyone should have taken offense at my silence in the face of this exchange of correspondence, it was the members of the settlement class whom Mr. Swift was representing.

Mr. Swift's recusal suggestion is all the more inappropriate because it comes a year and a half after this exchange of correspondence and after he was advised that I would reject his claim *and* those of other attorneys who also sought a risk enhancer, and after he was advised in a conference with Professor Neuborne that I would adopt the latter's generous suggestion regarding the excellence enhancement. The purpose of the conference was simply to determine whether Mr. Swift would appeal. If he intended to do so, I would write a more comprehensive opinion than otherwise. Thus, Mr. Swift's motion is not only without merit; it is as untimely as it is inexplicable.

## CONCLUSION

I deny the application for a risk enhanced multiplier or for a percentage fee equal to slightly less than 1% of the Settlement Fund to be divided by him and others who joined in his application. I also reject Mr. Swift's request that his firm's lodestar be enhanced by a multiplier of 2.29. Swift Mem. at 16. I award the full amount of Kohn Swift & Graf's lodestar enhanced by $270,578 for a total recovery of $1.125 million recommended by Professor Neuborne and disbursements of $158,336.53. Only one law firm has received a more generous award and that award was based on an unenhanced lodestar. While Mr. Swift has requested an evidentiary hearing, I reject that suggestion. Some of the issues he raises do not underlie my ruling, Swift Letter dated Sept. 17, 2002, at p. 2, others, mainly involving the Neuborne declarations, are pointless since those declarations provide the basis for the award of his full lodestar and a generous excellence enhancer.

**SO ORDERED.**