**In re HOLOCAUST VICTIM ASSETS LITIGATION.**

Nos. CV–96–4849(ERK)(MDG), CV–99–5161, CV–97–461.

United States District Court, E.D. New York.

March 31, 2004.

Burt Neuborne, New York University Law School, New York City, lead class counsel.

Robert A. Swift, Kohn, Swift & Graft, P.C., Philadelphia, PA, one of plaintiffs' class counsel.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Holocaust Survivors Foundation–USA, Inc.

William Schwartz, Cadwalader, Wickersham & Taft LLP, New York City, for Dr. Thomas Weiss.

Roger M. Witten and Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

I write here to address the outstanding counsel fee request of Samuel J. Dubbin in connection with the settlement of this class action. The background of this case is set forth in *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139 (E.D.N.Y. 2000), and prior discussion of counsel fee requests can be found at *In re Holocaust Victim Assets Litigation*, 270 F.Supp.2d 313 (E.D.N.Y.2002), and *In re Holocaust Victim Assets Litigation*, 302 F.Supp.2d 89 (E.D.N.Y.2004). In a memorandum and order dated March 9, 2004, I explained the scope of the fee application at issue here as follows:

> Two years ago, Mr. Dubbin submitted a fee application that was almost equal to the total amount of legal fees awarded to those counsel who were compensated for their role in obtaining the $1.25 billion settlement with the Swiss banks. Specifically, Mr. Dubbin requested $3.6 million in fees and compensation for himself and an additional award of $2,315,250 for [his then client,] Dr. Thomas Weiss, a founding member of [Holocaust Survivor Foundation–USA]. Mr. Dubbin also sought expenses in the amount of $70,260.87. Of the total $5.9 million that Mr. Dubbin seeks, approximately $3 million is for his efforts on behalf of HSF–USA and its predecessor, the South Florida Holocaust Survivors Coalition, with respect to his objective described in the earlier parts of [my March 9, 2004] opinion—namely, his effort to rectify the allegedly disproportionate sum allocated to survivors in the United States. The remaining $2.9 million, of which Mr. Dubbin seeks [approximately] $600,000

> for himself and $2.3 million for Dr. Weiss, who was Mr. Dubbin's client, is for services rendered in connection with Dr. Weiss's objection to the releases granted to Swiss insurance carriers as part of the global settlement of all claims against Swiss business entities.

*In re Holocaust Victim Assets Litigation*, at 116–117 (citations omitted). The figures are now substantially diminished. In my March 9, 2004 decision, I explained my reasons for rejecting the various objections filed by Mr. Dubbin on behalf of Holocaust Survivors Foundation–USA, Inc., (HSF–USA), and I denied outright Mr. Dubbin's fee request as it pertained to allocation issues in this case. *See id.* Shortly thereafter, Dr. Weiss, who has retained new counsel, withdrew in its entirety the $2.3 million fee request that Mr. Dubbin had filed on his behalf. *See* Letter from William Schwartz to Judge Korman, dated March 25, 2004 ("This is to confirm that my client, Dr. Thomas Weiss, has directed me to withdraw his application or petition for compensation in this matter."). Then, as I prepared to issue this opinion, Mr. Dubbin himself sought a reduction in his fee request. *See* Modified Fee Request of Dubbin & Kravetz, LLP, dated March 31, 2004 (hereafter "Modified Fee Request").

Mr. Dubbin continues to seek fees for work performed with respect to the litigation releases provided to Swiss insurance companies in the course of this case. Until today, Mr. Dubbin demanded a lodestar amount of approximately $550,000 in legal fees with an enhancement, and $95,000 in expenses. *See* E-mail from Samuel Dubbin to Burt Neuborne, dated June 14, 2003. Now he requests $309,051 plus expenses of $41,318. *See* Modified Fee Request, at 3. Because of the late timing of his modification, this opinion is written largely in reference to the original numbers. My analysis applies equally to Mr. Dubbin's modified request. Mr. Dubbin

claims that his request is modest in light of the significant time and research that he contributed to the debate over how to treat Swiss insurance companies under the settlement. To the contrary, as I suggested in my opinion of March 9, 2004, *see In re Holocaust Victim Assets Litigation,* at 117–118, the original request was grotesque, and even the modification reflects delusion. Consequently, I now deny outright the remainder of Mr. Dubbin's fee application.

Mr. Dubbin's fee request is based on an extraordinarily inflated view of the importance of his contribution to the resolution of this case. In his original fee application, Mr. Dubbin wrote: "Counsel's clients' objections led to the preservation of the world-wide class of Holocaust Survivors' claims against Swiss insurers, with a minimum value of $100 million." Verified Motion for Attorneys' Fees and Expenses, filed March 15, 2002, at 1 (hereafter "Fees Motion"). Notwithstanding this accomplishment, which is alleged to justify the fee request at issue here, Mr. Dubbin filed a notice of appeal on behalf of Dr. Weiss in an unsuccessful attempt to extort a significant cash award from the settlement fund. As I will explain, I rejected that attempt and I reject Mr. Dubbin's fee application. Before addressing in detail his fee request, I explain what actually took place leading to "the preservation of the world-wide class of Holocaust Survivors' claims against Swiss insurers." When viewed against this background, the absurdity of Mr. Dubbin's fee application becomes apparent.

### Background

In 1998, I participated in the negotiations that led to the Settlement Agreement in this case, and I am aware that both sides were committed to achieving a global settlement that was fair and complete. The primary focus was on defining the five principal classes of plaintiffs as delineated in the Settlement Agreement—the Deposited Assets Class, the Looted Assets Class, Slave Labor I, Slave Labor II, and the Refugee Class—and arriving at an acceptable sum of money for which to settle. But equally important was deciding what entities should be released from future liability. As a general matter, the settlement sought to release all businesses "where at least 25 percent of the outstanding stock is owned by a Swiss company." *In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d at 160. Without explicitly identifying them, the Settlement Agreement thus proposed to release Swiss insurance companies. The parties were conscious of this and specifically excluded from these releases three Swiss insurance companies—Basler Lebens–Versicherungs–Gesellschaft, Zürich Lebensversicherungs–Gesellschaft, and Winterthur Lebensversicherungs Gesellschaft—against which litigation was pending in the United States. They were excluded "to the extent of insurance claims of the type asserted in *Cornell, et al. v. Assicurazioni Generali S.p.A.,* 97 Civ. 2262 (S.D.N.Y.)." Settlement Agreement, Section 1, Definitions.

The initial decision to release all Swiss businesses—except for three named Swiss insurance companies—from future liability was based on practical considerations. A global settlement was the only way the defendants would agree to a $1.25 billion settlement, and when it became apparent that such a settlement would include Swiss insurance companies, plaintiffs' counsel considered their options. None of the released insurance companies were subject to personal jurisdiction in the United States. And because bringing suit elsewhere was not a realistic option, plaintiffs' counsel concluded that they were giving up essentially nothing by agreeing to the releases. In the context of a $1.25 billion settlement, plaintiffs' counsel decided that agreeing to the exchange brought substan-

tially more benefit to victims of Nazi persecution than could have been achieved by litigation.

After the Settlement Agreement was consummated, I began to disseminate notice in May 1999. The notice plan I employed was extensive and is described in *In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d. at 144–45. Among the most critical aspects of the notice plan was designing a way for class members and other interested parties to raise objections to the Settlement Agreement. I ordered that all objections from interested parties be filed in writing by October 22, 1999. *See* Order, dated May 10, 1999. Then, on November 29, 1999, I would hold a fairness hearing where objectors and other interested parties could voice their concerns. *Id.*

Before the October 22, 1999 deadline, I received approximately 200 written comments and objections to the Settlement Agreement. Only one concerned the release of Swiss insurance companies. That objection, dated October 20, 1999, was filed by Washington State Insurance Commissioner Deborah Senn. *See* Partial Objection of Washington State Insurance Commissioner Deborah Senn to Class Action Settlement (hereafter "Senn Objection"). Commissioner Senn recognized that she was not a part of the class of plaintiffs but moved for leave to object on the grounds that she "believe[d] that insurance claims involving all Swiss insurers and reinsurers, and not just these three named companies [that were excluded from the releases], should be handled by the existing International Commission on Holocaust Era Insurance Claims." Motion of Washington State Insurance Commissioner Deborah Senn to file Partial Objection to Class Action Settlement, at 1–2. The International Commission on Holocaust Era Insurance Claims (ICHEIC) was established in 1998 after negotiations among the

World Jewish Restitution Organization (WJRO), United States insurance regulators, and several European insurance companies. *See generally www.icheic.org.* It was designed to provide Holocaust survivors and their heirs with a way to identify and obtain payment for insurance claims never paid in the wake of the Holocaust. It works closely with the German Foundation "Remembrance, Responsibility, and the Future" (hereafter "the German Foundation"), which administers a $5 billion fund established in 1999 to provide money for claimants against German companies, including insurance companies.

Commissioner Senn made two basic objections. She summarized the first point of her argument as follows:

> The proposed settlement is unfair to insurance policyholders and beneficiaries. It releases all claims against all Swiss insurers and reinsurers (except only Winterthur, Basler Lebens and Zurich). There has been no public review of their records to determine their unpaid Holocaust policies or their value. These companies may be released from many millions of dollars of wrongfully unpaid claims in exchange for relatively *de minimis* payments to policyholders or their heirs. Class members are required to decide whether to opt out of the class without even being told whether they or a family member were covered by policies or the face amount of such policies, although this information may be in the possession of the settling companies. The proposed settlement undermines the International Commission on Holocaust Era Insurance Claims whose protocols provide identification, valuation and payment of policies.

Senn Objection, at 1–2. Her second claim was that,

> [t]he settlement notice is inadequate. It does not provide notice of the specific

insurance companies whose polices are covered by the release. It does not inform class members that participation in the settlement would preclude them [from] recovering on insurance policies through ICHEIC. And perhaps most egregiously, the notice and glossary largely conceal from all but the most careful reader that insurance policy claims are even subject to the settlement and release.

*Id.* at 2. In other words, Commissioner Senn maintained that the Settlement Agreement "creates a substantial possibility that class members will unintentionally and unknowingly release insurance claims of substantial value." *Id.* at 7. Again, Commissioner Senn's objection was the *only* objection received in a timely fashion that dealt with the insurance releases. Mr. Dubbin submitted nothing.

Subsequently, on November 18, 1999, Lawrence Eagleburger, the Chairman of ICHEIC, submitted a letter echoing the sentiments of Commissioner Senn. *See* Letter from Lawrence Eagleburger to Judge Korman, dated November 18, 1999. He explained that "ICHEIC has established a claims process for the payment of unpaid Holocaust-era insurance claims." *Id.* at 1. He continued:

We are attempting to persuade all companies with Holocaust-era liabilities to join ICHEIC in order to provide as comprehensive a mechanism as possible for resolving unpaid insurance policies. Accordingly, the Swiss Life Group, along with some other companies, was invited to join the Commission in June 1999. Thus far, they have not responded.

Under the settlement agreement as now proposed, Swiss insurance companies which are not participating in the ICHEIC process will be relieved of any Holocaust-era obligations, while those which are being cooperative will not be released. This anomalous result would appear to be manifestly unfair to the very people we are trying to help: those with legitimate claims.

*Id.* at 2. While the thrust of the Senn and Eagleburger objections was on maintaining the ongoing viability of ICHEIC— something not ultimately relevant to the decision to amend the Settlement Agreement—they caused me to focus on the validity of the insurance releases.

Not until one more week had passed (and only five days remained until the fairness hearing) did I receive anything from either Mr. Dubbin or his client, Dr. Weiss. Specifically, on November 24, 1999, I received a letter via fax from Dr. Weiss, which stated, in its entirety:

Dear Judge Korman,

It was brought to my attention that the Swiss bank settlement of $1.25 billion releases the Swiss insurance companies, except for the three companies named in the class action lawsuit, from any further liability. *This is completely unacceptable, as many Swiss insurance companies acted as cloaking agents for Munich [Reinsurance] of Germany during WWII.* U.S. military and intelligence/legal documents from 1944–47 state this explicitly and charge Munich Re: with criminal activity. Additionally, this surreptitious inclusion of these companies is not known to the general survivor community. Your assistance to remove this inappropriate blanket amnesty for the Swiss insurance industry is vital.

The Bergier report states that the amount that the Swiss owe regarding stolen WWII gold may exceed six billion dollars. The documents further state that although the Swiss banking industry stopped receiving gold at a point before the end of the war (as a result of Treasury Secretary Henry Morganthau's admonition that there will be a

day of reckoning) the Swiss insurance industry continued receiving stolen gold up to the last days of the war. Justice demands that the Swiss insurance industry not escape its responsibility.

Sincerely,

Thomas Weiss, MD

Letter from Thomas Weiss to Judge Korman, dated November 24, 1999 (emphasis added). This letter was the only written submission I received from either Mr. Dubbin or Dr. Weiss in advance of the fairness hearing, and it was more than thirty days after the deadline for submitting written objections had passed. The letter itself stated little more than a general notion that the insurance companies had done wrong and that releasing them was therefore inappropriate. More to the point, the letter did not address the actual defect in the insurance releases, focusing instead on the extent to which Swiss insurance companies engaged in cloaking assets. Whether a company cloaked—that is, hid—assets on behalf of the Nazis is wholly irrelevant to a claimant who is seeking to recover from an insurance company for a policy once held by a victim of Nazi persecution. Moreover, to the extent that it dealt with Swiss insurance companies' dealing with Nazi gold, it could only be relevant to a Looted Assets claim, which, as I have explained, could never have survived a motion to dismiss. *See In re Holocaust Victim Assets Litig.*, at 93–94; *see also In re Holocaust Victim Assets Litig.*, 14 Fed.Appx. 132, 134 (2d Cir.2001) (stating that looted assets claims were "based on novel and untested legal theories of liability, would have been very difficult to prove at trial, and will be very difficult to accurately valuate"). It is with these submissions that I approached the fairness hearing.

Many people spoke at the fairness hearing, including survivors, attorneys, and interested members of the community. Ear-

ly in the day, Roman Kent, a Holocaust survivor and Chairman of the Board of the American Gathering of Jewish Holocaust Survivors, spoke. He commended the settlement but added that, "under no circumstances [should] this settlement ... give what I call a one-way street to heaven to the insurance companies." Fairness Hearing Transcript, at 23. He continued: "The insurance companies are subject to the International Committee of Insurances, which is chaired by [Lawrence Eagleburger], and they should not get a blank, what you can call maybe legal closure, whatever it is, because they should be subject to the international insurance claims." *Id.* Mr. Dubbin spoke later and added little. But he was not alone. Two more lawyers, first Mark Dunaevsky and later Norman Rosenbaum, followed Mr. Dubbin and once again echoed the same concerns. *See id.* at 88–91, 175. Neither of these lawyers sought a fee. In any event, I turn now to Mr. Dubbin's testimony.

Mr. Dubbin explained his purpose as follows:

My specific point today is to address one aspect of the settlement in particular, and that is the extent to which the settlement purports to release an infinite number of unnamed Swiss companies, particularly insurance companies, other than those which are enumerated in the settlement agreement as being involved with the International Commission on Insurance Claims.

Fairness Hearing Transcript, at 62. First, Mr. Dubbin's description of the Settlement Agreement was incorrect and reflected both his general lack of familiarity with the Settlement Agreement and his ill-prepared presentation. As I explained earlier, the Settlement Agreement specifically excluded certain insurance companies from its definition of Releasee, but not those that Mr. Dubbin identified. Instead, it

named three companies known to be subject to personal jurisdiction—and indeed, facing pending litigation—in the United States. Whether or not they were involved with ICHEIC was irrelevant.

Mr. Dubbin next proceeded to present information concerning German insurance companies that had "used a variety of dummy companies or real companies to cloak their real assets and resources." *Id.* at 63. He explained that Dr. Weiss had done research on this issue and could present documentation as to the extent of such activity. He then described in detail a report from the Office of Military Government for Germany, dated September 1946, that provided an example of such cloaking. But this discussion, too, revealed Mr. Dubbin's misunderstanding of the Settlement Agreement. The Settlement Agreement expressly excluded from its definition of Releasees many (although not all) companies that "disguised the identity value, or ownership of Cloaked Assets or Slave Labor." Settlement Agreement, Section 1. Indeed, Mr. Dubbin now concedes that this provision of the Settlement Agreement "would have prevented a release to companies that are ... direct corporate descendants of pre–1945 German companies (or companies headquartered in an Axis controlled country) and which also cloaked assets." Response to Neuborne Supplemental Declaration filed by Samuel J. Dubbin, dated September 5, 2003, at 12 (hereafter "September 5, 2003 Response"). Between this misconception and the more central fact that Mr. Dubbin completely failed to address how the cloaking of Nazi assets would impact beneficiaries to insurance policies and their heirs in their attempt to collect on insurance claims, Mr. Dubbin's complaint was largely beside the point. Indeed, it failed altogether to address the central issue of prejudice suffered by beneficiaries of policies issued by released insurance companies.

Mr. Dubbin concluded his remarks as follows:

So the question presented by this, and I have other documents here that come to the same basic conclusion, is why a blanket release of unnamed and unidentified companies, which we know from evidence in the archives may well have been beneficiaries of looted Jewish assets through the access in Nazi insurance trusts, without being even identified or held to account in any way, shape or form for what their responsibilities are.

I know that Commissioner Senn in the State of Washington and Chairman Eagleburger have brought this question to the Court's attention. But particularly in light of some of the documents we have found, we felt on behalf of the Florida survivor community and Dr. Weiss in particular, we would urge you—and I know Mr. Neuborne said if we have any problems with the settlement, please bring them to his attention.

I don't know what benefit accrues to survivors from what may be a big surprise at the end of the road, when we find out some of the companies not even identified today being released could well be as culpable as some of the ones who we've been talking about all these years. Thank you very much.

Fairness Hearing Transcript, at 65–66. This testimony is the sum total of Mr. Dubbin's contribution to my consideration of the insurance releases. It utilized his client's research to repeat and elaborate on the letter his client had sent me a week earlier. The testimony focused on looted assets and added nothing to the legal arguments that Commissioner Senn had already advanced in a timely fashion. Nor did it raise the valid legal claim that troubled me the most and that ultimately com-

pelled me to direct the renegotiation of the insurance releases.

Directly after the fairness hearing, concerns that had been brewing led me to call a conference with the parties. After the parties had a time to prepare, we held a conference on December 22, 1999, some three weeks after the fairness hearing. One of the purposes of the meeting, as recorded by Deputy Special Master Shari Reig, was to "discuss[ ] the two key issues that Judge Korman has made it clear he wants to resolve prior to ruling on the fairness of the settlement—art and insurance." Memorandum from Shari C. Reig to Judah Gribetz, dated December 27, 1999. In the end, I insisted that the insurance releases be renegotiated not because Swiss insurance companies had cloaked assets or engaged in other wrongdoing unrelated to avoiding payment of insurance policies issued to victims of Nazi persecution. Rather, I was concerned with the straightforward legal point that, as originally drafted, the insurance releases were unenforceable because Swiss insurance companies were released from claims by beneficiaries or heirs who were not receiving any direct and distinct benefit for these releases. In addition, these potential claimants were not adequately informed that their claims were being released. In granting the releases, the parties had implicitly recognized that, because of the lack of personal jurisdiction over these companies and the difficulties that would have almost certainly prevented successful lawsuits anywhere else, the releases were essentially worthless and unenforceable. Nevertheless, as a legal matter, they were claims that could not be signed away without some *quid pro quo.* See *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir.1981). Or, as Mr. Dubbin put it for the first time in defending his fee application (four years after the fairness hearing):

In *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir.1981), the Second Circuit squarely rejected the argument that it would acceptable for a federal court to approve a settlement that compromised some claims for no consideration because a subsequent court might refuse to enforce the release language due to its invalidity. The settlement negotiators in *Super Spuds* urged the Court to approve a class settlement that released certain claims for no consideration because the state court where the released claims might later be pressed could decide whether the federal class action release was in fact valid. The Second Circuit did not agree: "A federal court should determine for itself whether it has that power and may properly exercise it, not pass over the question because a state court may assume the unenviable task of deciding that its act was a nullity."

September 5, 2003 Response, at 14. Of course, Mr. Dubbin never made this argument until his fee was at stake, years after the issue of insurance releases had been resolved.

By the time of the December 22, 1999 meeting, I had become convinced that the insurance releases were unenforceable as drafted. Indeed, when I eventually approved the amended settlement, I wrote: "[I]f the carriers do not reaffirm [the amended insurance releases], I will issue a supplemental decision on the enforceability of the original insurance releases." *In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d at 165. I was prepared to hold them unenforceable as violating the consideration requirement of *National Super Spuds,* 660 F.2d 9. This legal defect is why I asked Professor Neuborne to reenter negotiations. It had nothing to do with the five minutes of testimony Mr. Dubbin had presented at the fairness hearing. If

any submission is to be credited for opening this reconsideration, it is that of Commissioner Senn, who in a *timely fashion* pointed out that there was a problem with the *"de minimis"* return class members were going to receive from the insurance releases and the general insufficiency of the notice.

Six weeks after I had directed Professor Neuborne to renegotiate the insurance releases, and a full three months after it was due, Mr. Dubbin filed a written objection to the Settlement Agreement. *See* Objection of South Florida Holocaust Survivors Coalition and Thomas Weiss, M.S., dated January 31, 2000 (hereafter "Settlement Agreement Objection"). There is no suggestion that Mr. Dubbin was unaware of the filing deadlines or otherwise prevented from submitting a timely filing. To the contrary, on October 21, 1999, he had written to Special Master Judah Gribetz and stated that he and his clients "understand that objections to the overall settlement are due on October 22." Letter from Samuel J. Dubbin to Judah Gribetz, dated October 21, 1999 (appended to Settlement Agreement Objection). Yet at that time he had not requested additional time to file an objection; he had simply requested an opportunity to appear at the fairness hearing, which of course, he was given. Mr. Dubbin did not even mention insurance releases as something he wished to address.

Ultimately, Mr. Dubbin's belated objection was of no consequence. It chronicled archival research that Dr. Weiss had uncovered and that purportedly revealed the expansive scope of the Nazi era insurance scandal, with particular reference to insurance companies being used to cloak assets. *See* Settlement Agreement Objection. In the context of the Settlement Agreement, this research was largely beside the point. At core, Mr. Dubbin's objection made three arguments:

This filing addresses three substantial reasons it would be unfair for the Court to approve the blanket release of Swiss insurance companies as now proposed. First, several Swiss insurers were used to cloak the assets of the major Nazi-based insurance companies, Allianz and Munich Reinsurance. No one knows today which releasees might be responsible for portions of hundreds of thousands of insurance policies or other Jewish assets that were successfully cloaked by Allianz and Munich Re within Swiss companies. Second, these transfers and cloaking efforts were designed to conceal a massive German insurance and reinsurance juggernaut which grew to dominate the European insurance market by virtue of the Nazi oppression and economic power. The key was the invisible reinsurance market, through which the Nazis controlled insurers and thereby business and finance throughout Europe. As one important Allied Report noted, the insurance business was regarded as 'the handmaiden of German industrial expansion in occupied countries.' Third, Swiss insurers profited directly and handsomely from the German insurance market during World War II. They also profited from gold looted by the Nazis from Jews and other victims.

Settlement Agreement Objection, at 6–7. That Swiss insurance companies had engaged in wrongdoing was never in dispute. But to the extent that this wrongdoing consisted of cloaking assets, there could be no legal liability without some showing that cloaking of assets in some way prejudiced the ability of insurance policy beneficiaries to collect. The only issue that was in dispute was what should be done about Swiss insurance companies that were not subject to personal jurisdiction in the United States and against which claims could be made for insurance policies issued to

victims of the Holocaust. In the course of his objection, Mr. Dubbin did not even quote the definition of Releasees. Nor did he account for the exclusion of certain insurance companies that had engaged in cloaking assets. Indeed, although he wrote in his objection that "[t]he central question concerning the present releases is the extent to which Swiss insurers who would be released are, in reality, direct economic descendants of the Nazi insurance and reinsurance empire which deprived hundreds of thousands of Holocaust victims of their insurance moneys," *see id.* at 20, he conceded years later that the definition of Releasees "would have prevented a release to companies that are ... direct corporate descendants of pre–1945 German companies (or companies headquartered in an Axis controlled country) and which also cloaked assets." September 5, 2003 Response, at 12.

The likely reason that Mr. Dubbin's objection was not narrowly tailored to the Settlement Agreement in this case is that it was based on research his client had done in preparing for a separate litigation. Since 1998, Mr. Dubbin had represented Dr. Weiss in a multi-district litigation case pending in the Southern District of New York in which Dr. Weiss was suing an Italian insurance company, Assicurzaioni Generali, S.p.A., for recovery on an insurance policy purchased by his father prior to World War II. Mr. Dubbin summarized the work that Dr. Weiss had done:

> By early 1998, Dr. Weiss had begun to conduct and commission private research from various archival and academic sources, including the U.S. National Archives in Washington, D.C.; European archives; specialized repositories of information such as the College of Insurance in New York City; Yad Vashem (the Holocaust Memorial Museum in Jerusalem); and other sources; as well as to consult at length with insurance experts such as Professor Joseph Belth, Professor Emeritus of Insurance at Indiana University. At considerable personal expense in time and money, Dr. Weiss retrieved and analyzed thousands of pages of archival records, most of which described decades-old business transactions in the lexicon of the early and mid–20th Century. The Florida Survivor's written Objections and later filings with the Court reflect many of the countless hours Counsel and Dr. Weiss spent scouring, digesting, analyzing, and discussing those materials.

Fees Motion, at 15. At my request, Mr. Dubbin provided me with copies of several of his filings in the *Generali* case, and they are substantial. These, in conjunction with the Settlement Agreement Objection, reveal that Dr. Weiss had indeed performed research regarding not only the insurance policy belonging to Dr. Weiss's father, but also the practice of Nazi era insurers and reinsurers in general. Nevertheless, that research has had no impact on this case. Or, as Professor Neuborne has written, "the work was unnecessary." Supplemental Neuborne Declaration, at 10. Dr. Weiss, who performed the research but withdrew his compensation request, has apparently come to recognize this. Mr. Dubbin has not.

In any event, the negotiations that recommenced in mid-December 1999 continued for some months. Mr. Dubbin argues that, even if his belated written objection played no role in the decision to reassess the issue of claims to life insurance policies, he should be compensated for it because he was not made aware of the negotiations until April 2000. *See* September 5, 2003 Response, at 10–11. It would be a different matter if Mr. Dubbin had gone to the time and effort to file his objection in a timely fashion. If the objection had any merit, then it might be unfair to deny him a fee because he could have been working

on the assumption that a written objection was necessary. Here, his written objection was filed three months late and two months after other more pertinent objections had been raised. He could make no assumptions. Indeed, the best that he could have hoped for was that his written submission would not be rejected as untimely.

Mr. Dubbin also complains of not being invited to join the negotiations. Mr. Dubbin claims that immediately after learning of the negotiations, he wrote to both parties seeking a chance to participate. *See* Letter from Samuel J. Dubbin to Professor Neuborne and Mark Kahn, dated April 10, 2000. Though Professor Neuborne contends that Mr. Dubbin was in fact alerted long before of the existence of negotiations, *see* Supplemental Neuborne Declaration, at 10, this debate is irrelevant as Mr. Dubbin has never suggested that he was affirmatively misled on this score. Professor Neuborne responded to Mr. Dubbin's request on May 12, 2000 by writing:

> I sympathize with your desire to play a more significant role in this case. Unfortunately, no complex class action can open the negotiation process to every lawyer who asserts expertise and interest. Your concerns with the original insurance releases were widely shared, and have been the subject of discussion between and among highly skilled counsel for many months. I can assure you that whatever potential settlement emerges from the ongoing insurance discussions, your clients will have a full opportunity to opt out of any insurance agreement with which they disagree, without jeopardizing their other rights under the basic settlement agreement. I can also assure you that any agreement that emerges will be subject to notice, public comment, and a full hearing before the Court under Rule 23(e).

Letter from Professor Neuborne to Mr. Dubbin, dated May 12, 2000.

In May 2000, after considerable negotiations, the parties (without Mr. Dubbin's involvement) were able to agree on acceptable language for an amendment to the Settlement Agreement concerning the releases given to Swiss insurance companies. In approving the amended Settlement Agreement, I described the development as follows:

> In connection with the fairness hearings, I received several well-taken objections to the inclusion of insurers as 'Releasees' under the Settlement Agreement. The objections related to the effectiveness of notice as to claims against released Swiss insurers and the appropriateness of releasing such insurers in the absence of a mechanism to pay valid Holocaust-related insurance claims as part of the distribution of the settlement fund.

*In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d at 160. Mr. Dubbin appears to argue that my three words, "well-taken objections," entitle him to a fee. *See* Fees Motion, at 18. I disagree. If this language caused Mr. Dubbin to assume that his was one of the "well-taken objections" that I credited with bringing about the amended insurance releases, then I painted with too broad a brush. If any objection merited credit it was that of Commissioner Senn, which was filed in a timely fashion and at least alluded to one of the ultimate defects in the releases. Mr. Dubbin, of course, adopted by reference her objection and the related objection of Chairman Eagleburger when speaking at the fairness hearing. In any event, I continued:

> [T]he parties and major Swiss insurers released under the Settlement Agreement, after extensive discussions, have agreed on a mechanism to evaluate and

pay Holocaust-related insurance claims. The mechanism, set forth in Article 4 of Amendment 2 to the Settlement Agreement, specifically designates up to $100 million (including up to an additional $50 million provided by the insurers themselves) for the resolution of unpaid insurance claims. The mechanism provides for prompt and fair consideration of all insurance claims, appropriate multipliers for such claims, full cooperation of the participating insurers in providing relevant documentary material to potential claimants (subject to monitoring by the Swiss insurance supervisor) and assurance of payment from the settling defendants. The amendment also contains a provision that acknowledges my power to order participating insurers to disclose the holders of policies, with the consequence of an insurer's failure to comply being the exclusion of such insurer from all provisions of the Settlement Agreement. My power to order such disclosure is subject to the application of certain standards that are not inconsistent with the good faith duty of a releasee to make disclosures necessary to permit class beneficiaries to obtain the benefits of the Settlement Agreement. The details of the insurance claims mechanism and the list of participating released insurers will be part of the notice of the proposed plan of allocation and distribution, and class members will have an opportunity to opt out of the insurance provisions of Amendment 2.

*Id.* (internal citation removed). Under the circumstances, the amendment to the Settlement Agreement alleviated my concerns about the insurance releases. I wrote:

I find that the insurance provisions of Amendment 2 are fair and reasonable, and adequately address the concerns raised in the objections submitted in connection with the fairness hearings. Accordingly, they merit approval as part of the settlement. In reaching this decision, I have considered all of the relevant factors and circumstances, including the status of insurers as releasees under the Settlement Agreement, the addition of up to $50 million to the settlement amount and the unavailability of a superior mechanism for the payment of Holocaust-related claims involving such insurers. I have also relied upon the following representations by the participating insurance carriers: (i) the amount of unpaid 'Policy Claims' under Amendment 2 is not likely to exceed $100 million in the aggregate (including multipliers) and (ii) most of the participating insurance carriers have reasonably complete surviving documentation that will permit them (and the settlement's insurance claims mechanism contemplated by Amendment 2) to provide fair and efficient consideration of all claims.

*Id.*

After I had approved the fairness of the amended Settlement Agreement, Mr. Dubbin wrote a letter outlining alleged deficiencies in the Settlement Agreement as it pertained to insurance companies. *See* Letter from Samuel Dubbin to Judge Korman, dated September 1, 2000 (appended to Declaration of Samuel J. Dubbin, dated March 31, 2004). Shortly thereafter, Mr. Dubbin informed me (either directly or through Professor Neuborne) of his intent to file a notice of appeal from my judgment on behalf of Dr. Weiss. Mr. Dubbin asked if I would speak with Dr. Weiss in advance of any notice of appeal, and ultimately, a telephone conference was held between myself, Mr. Dubbin, Dr. Weiss, and Professor Neuborne. That conference is described briefly in my March 9, 2004 memorandum and order, *see In re Holocaust Victim Assets Litig.*, at 117–118. I explained to Mr. Dubbin and Dr. Weiss that their proposed appeal was without

merit and I attempted to convince them that filing a notice of appeal could only harm the class. They were unconvinced. More important for the purpose of this opinion, at the meeting they revealed their true colors. After the discussion appeared to be going nowhere, Dr. Weiss asked how much I would pay to prevent them from filing a notice of appeal. Specifically, he wanted me to provide attorneys fees and funds for private research that would assist him in his litigation against Generali. This was beyond the pale. I was not going to be blackmailed, particularly with funds that belong to Holocaust survivors. Professor Neuborne described the incident more diplomatically as follows:

> Any person familiar with class action litigation will understand that Mr. Dubbin's tactic in filing the appeal was an effort to play 'hold-up,' by placing a legal obstacle in the path of the settlement's administration that could be removed by acceding to his client's financial demands. In fact, his client attempted to extract funds from the settlement class to fund a Holocaust-related research institution that he would head.

Affirmation of Professor Neuborne, dated February 18, 2004. Any doubt that this was an attempted "hold-up" is eliminated by comparing the glowing description of the amended Settlement Agreement contained in Mr. Dubbin's fee application with what came next.

On September 7, 2000, Mr. Dubbin filed, on behalf of Dr. Weiss, an appeal from the judgment approving the amended Settlement Agreement. Eventually, Mr. Dubbin would withdraw the appeal without ever filing a brief. Professor Neuborne placed this in context: "When [months later] the Court refused even to appear to bargain over the withdrawal of the appeal, and I adamantly refused to engage in negotiations, Mr. Dubbin unconditionally withdrew the appeal filed on behalf of Dr. Weiss without ever making a serious ef-

fort to prosecute it." *Id.* Though Mr. Dubbin contends that this appeal produced concrete results, *see* Fees Motion, at 62–63 (citing Letter from Professor Neuborne to Mr. Dubbin, dated May 15, 2001), I disagree. It certainly did not change anything with respect to Swiss insurance companies. Regardless, other appeals remained, and not until July 26, 2001 did the Second Circuit affirm my decision, allowing distribution to begin. *See In re Holocaust Victim Assets Litig.*, 14 Fed. Appx. 132 (2d Cir.2001).

To recap, this is what Mr. Dubbin did in connection with the renegotiation of the releases of Swiss insurance companies in this case: First, he submitted nothing prior to the deadline for written objections to the Settlement Agreement and nothing prior to the fairness hearing. Second, Mr. Dubbin spoke briefly at the fairness hearing repeating the sentiments and research of his client, expressing his approval of objections that had been filed in a timely matter by other individuals, and adding his concern that many Swiss insurance companies engaged in cloaking assets. Third, Mr. Dubbin filed a largely irrelevant written objection based on research by his client three months late and six weeks after I had decided that the insurance releases were unenforceable. Fourth, Mr. Dubbin stood by as his client attempted to extort a significant cash award from a fund belonging to Holocaust survivors in exchange for not filing a notice of appeal from my judgment approving the fairness of the settlement. And fifth, Mr. Dubbin filed that notice of appeal. For this, he initially sought $600,000, and now seeks $309,051 in fees plus $41,318 in disbursements.

### Discussion

Not all work is entitled to be compensated, even when that work is done in the context of a lawsuit. In this case,

Mr. Dubbin is seeking payment from the settlement fund under "the common fund doctrine."

The common fund doctrine allows a court to distribute attorney's fees from the common fund that is created for the satisfaction of class members' claims when a class action reaches settlement or judgment. The doctrine is grounded in the principles of quantum meruit and unjust enrichment, in two senses. First, the doctrine prevents unjust enrichment of absent members of the class at the expense of the attorneys. It is meant to compensate the attorneys in proportion to the benefit they have obtained for the entire class (the fund), not just the representative members with whom they have contracted. Second, the doctrine prevents the unjust enrichment of absent class members at the expense of the class representatives. In the absence of the doctrine, only the present members, who hired the attorneys, would have to pay attorney's fees, while all the members, both absent and present, would enjoy the benefits of the settlement or judgment. The members who did not hire the attorneys would be unjustly enriched at the expense of those who did.

Newberg on Class Actions, § 14.6 (4th ed.2002). The Second Circuit has stated that in common fund cases, "a fee award should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 53 (2d Cir.2000). More important for this case, the common fund doctrine presumes that, if attorneys' fees are to be paid from the fund, it will be because some benefit— be it monetary or otherwise—was conferred on the class by virtue of the attorney's work. After all, "[t]hose who receive no benefit from the lawyer's work should not be required to pay for it." *Van Ge-* *mert v. Boeing, Co.*, 573 F.2d 733, 736 (2d Cir.1978). Mr. Dubbin himself wrote that "a paramount consideration for awarding fees to an objector is the benefit to the class, [and] it is only appropriate that the amount of the fee award bear a reasonable relationship to the benefit conferred by virtue of the objections." Fees Motion, at 41.

Mr. Dubbin claims that his work in response to the proposed releases "led to the preservation of the world-wide class of Holocaust Survivors' claims against Swiss insurers, with a minimum value of $100 million." Fees Motion, at 1. Before I address the claim that Mr. Dubbin's work *caused* the renegotiation of insurance releases, I turn to Mr. Dubbin's claim that the amendment to the Settlement Agreement as it related to insurance companies was worth $100 million. Mr. Dubbin has written that, "[i]n approving the modified Settlement, the Court estimated the value of potential claims against Swiss insurers to be $100 million." *Id.* at 4. That is inaccurate. In my memorandum and order approving the amended settlement, I explained that the amendment of the Settlement Agreement relating to insurance companies created a means for claimants to seek money for unpaid insurance claims. I then wrote: "The mechanism, set forth in Article 4 of Amendment 2 to the Settlement Agreement, specifically designates up to $100 million (including up to an additional $50 million provided by the insurers themselves) for the resolution of unpaid insurance claims." *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d at 160. This was not an estimate of value; it was a description of the mechanism of distribution. The $100 million figure was a cap on payments, and it was set as a figure that the parties knew was far higher than any reasonable estimate of claims. Indeed, only two Swiss insurance companies ultimately agreed to the conditions

necessary to be granted a release. The Special Master's Interim Report on Distribution and Recommendation for Allocation of Excess and Possible Unclaimed Residual Funds, (hereafter "Interim Report"), explained: "In a document dated July 26, 2001, the parties entered into an agreement to process insurance claims for policies issued by the Swiss insurers Swiss Re and Swiss Life. No other Swiss insurers will receive releases in connection with this litigation" with respect to their duty to beneficiaries of insurance policies. Interim Report, at 106. As of June 30, 2003, only 1,238 claims to insurance policies had been submitted and found eligible for processing. *See id.*, at 108–9. Of the claims that have been specifically researched by insurance companies, most have been referred to the German Foundation Initiative for possible payment from the $5 billion fund it created. *Id.* at 109.

■ Mr. Dubbin alternatively contends that I am bound to value the aspect of the amendment to the Settlement Agreement that relates to insurance companies based on the total potential value to the class. *See* Sept. 5, 2003 Response, at 22 n. 26 (citing Newberg on Class Actions, at § 11–29; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir.1999)). He claims that because the potential added value was $100 million—in fact, it was only $50 million in "new money," *see* Letter from Samuel Dubbin to Judge Korman, dated September 1, 2000, at 5—this is the relevant value for awarding his fee. Mr. Dubbin is wrong. The cases he cites *allow* a court to treat the potential value to the class as the relevant value for measuring attorneys fees, but they do not require it. Meanwhile, to the extent that Mr. Dubbin claims that the amendment added value because it made clear that insurance companies which did not participate in the distribution mechanism would not be released,

Professor Neuborne accurately described the value of this narrowing as follows:

Assuming that the narrowing of the insurance releases permits a Holocaust victim to sue a Swiss insurance company, the actual economic value of such a claim appears quite modest. Insurance policies issued by Swiss companies in the German market are already covered by the German Foundation and by ICHEIC. My research indicates that virtually all Swiss-market policies have been paid. Thus, the insurance policy exposure appears to be for Swiss companies doing business in Europe, other than in Germany. While such potential liability may be significant, there is no reliable basis for assessing its economic value. Moreover, none of the originally released Swiss insurance companies appear to be within the *in personam* jurisdiction of a United States Court. The three Swiss insurance companies that appeared to be within the *in personam* jurisdiction of an American court had already been carved out of any insurance release. I know of no foreign tribunal in which such claims can be pressed effectively. Swiss pleading law makes it virtually impossible to use Swiss courts.

Supplemental Neuborne Declaration, dated July 21, 2003, at 8. This estimate is more realistic, and more tied to possible legal recovery, than the estimate of value provided by Mr. Dubbin's expert in today's belated and untimely filing. *See* Modified Fee Request, at ¶¶ 12–15. Indeed, Mr. Dubbin's expert fails entirely to address the practical reality that it was impossible for beneficiaries and their heirs to sue and recover against the companies that were no longer released. Professor Neuborne recognized that there was *some* value added by the amendment to the Settlement Agreement as it related to insurance companies, but concluded that it was "quite

modest, and unlikely to yield more than several million dollars in recoveries." *Id.* at 9. In retrospect, with only two participating companies, even this has proved to be optimistic.

 In any event, the precise value of the amendment regarding insurance companies is immaterial because Mr. Dubbin did not contribute to the amendment. Again, to be rewarded fees from a common fund as compensation for conferring a material benefit on the class, an individual must have actually done the work that led to the material benefit. *See Savoie v. Merchants Bank,* 84 F.3d 52, 56–57 (2d Cir.1996) (stating that "the district court must determine whether plaintiff's suit was a substantial cause of the benefit obtained."); *Savoie v. Merchants Bank,* 166 F.3d 456, 463 (2d Cir.1999) (affirming district court's denial of fees for work not "pursuing the interests of the class"); *Kaplan v. Rand,* 192 F.3d 60, 69 (2d Cir. 1999). Professor Neuborne described the effect of Mr. Dubbin's efforts as follows:

> Viewed most generously, Mr. Dubbin's efforts were helpful in reassessing the scope of insurance releases involving Swiss insurers who are not subject to *in personam* jurisdiction in the courts of the United States, and in exploring the possibility of inkind health care benefits to members of the plaintiff class. Unfortunately, neither initiative appears likely to confer a material benefit to members of the plaintiff-class.

Second Supplemental Declaration of Burt Neuborne Concerning the Award of Attorneys' Fees, dated April 10, 2002, at ¶ 5. In an earlier decision in this case, I explained at great length my reasons for crediting Professor Neuborne's opinion on the subject of attorneys' contributions to this case and appropriate fee awards. *See In re Holocaust Victim Assets Litig.,* 270 F.Supp.2d at 316–19. I stand by that belief, but I find Professor Neuborne's as-sessment of Mr. Dubbin's contribution to be overly generous. Mr. Dubbin cannot be credited at all for the renegotiation of the insurance releases in this case. His work was late, tangential, and ultimately irrelevant. While Mr. Dubbin has submitted timely and impressive work in connection with his fee application, he did not display such attention to his original objections.

Mr. Dubbin has argued that his objections were necessary because Commissioner Senn and Chairman Eagleburger lacked standing to object. *See* September 5, 2003 Response, at 8. He wrote: "In contrast, [my] clients, Dr. Weiss and the South Florida Survivors' Coalition, were the only objectors with standing to object, and who could have appealed an adverse ruling based on flaws in the insurance releases. [My] submission made it impossible for the Court to ignore the issue." *Id.* First, only Dr. Weiss appealed from my judgment approving the settlement. Second, it is hardly clear that either Dr. Weiss or the South Florida Survivors' Coalition had standing. Dr. Weiss's standing cannot be based on his insurance claim involving Generali, an Italian company not released in the settlement. The South Florida Survivors Coalition, meanwhile, never produced evidence of any member with standing. *See In re Holocaust Victim Assets Litig.,* at 114–117. If the only standing of either is based on the fact that Dr. Weiss is the child of Holocaust survivors, he had no greater standing than Roman Kent, a survivor who spoke at the fairness hearing along with Mr. Dubbin. Regardless, even if I concluded that Dr. Weiss or the South Florida Survivors' Coalition did have standing and all other objectors did not, that bare fact would hardly be enough to warrant the $2.9 million in fees initially sought by Mr. Dubbin and Dr. Weiss or even the newly reduced amount of $300,000 sought by Mr. Dubbin. My own

concerns made it impossible for me to ignore the issue—not Mr. Dubbin's belated submission. In a settlement as global and important as this, I was not going to refuse to consider a meritorious objection because the objector lacked standing. *See e.g.*, *In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89 (where I considered at great length the meritless arguments and objections of HSF–USA even though I found it did not have standing to object).

█ Mr. Dubbin has also suggested that were I to find—as I do—that his work made no contribution, it would be tantamount to breaking a promise. This argument is baseless. Mr. Dubbin relies on various statements by Professor Neuborne, not by me. On May 15, 2001, for example, Professor Neuborne wrote to Mr. Dubbin, "I have been impressed with the intensity of Dr. Tom Weiss's interest and the value of his contributions in this case." Letter from Professor Neuborne to Mr. Dubbin, dated May 15, 2001, at 2. Mr. Dubbin, of course, is not entitled to be compensated for his client's contributions. Unlike the usual case in which a lawyer performs the work, here it is uncontested that it was Dr. Weiss who did all of the research and the lawyer who added little (notwithstanding the statements of support by Dr. Weiss). Regardless, Mr. Dubbin also claims that when I met with him and Professor Neuborne in April 2001, Professor Neuborne stated that Mr. Dubbin's objections were "the first and most influential on the issue of the insurance releases," and "Sam [Dubbin's] filing . . . held our feet to the fire." September 5, 2003 Response, at 9. The record clearly shows that the objection Mr. Dubbin filed on behalf of Dr. Weiss and the South Florida Holocaust Survivors Coalition was not "the first" or "the most influential" of the objections on the issue of insurance releases. And the quality and content of Mr. Dubbin's legal work, if any, acted as a flame retardant. Moreover, whatever Professor Neuborne may have said in an apparent effort to placate Mr. Dubbin, who was then appealing the fairness of the Settlement Agreement and the method of allocating funds to needy members of the Looted Assets Class, is irrelevant to my consideration of what impact Mr. Dubbin's work actually had on the renegotiation of insurance releases in this case. Passing over whether Professor Neuborne in fact made these two remarks, I am not moved from my position.

Mr. Dubbin similarly claims that after meeting with me and Professor Neuborne, "it was understood that [he] would be compensated initially for all of [his] time expended on the insurance issues." September 5, 2003 Response, at 2. I frankly do not know on what basis Mr. Dubbin "understood" this. I always regarded the Dubbin / Weiss fee application as an outrage, and Mr. Dubbin knew it. Moreover, I could not possibly have agreed to compensate him "for all of [his] time expended on the insurance issues" without knowing how much time that was. I never made any commitments to Mr. Dubbin, and if Professor Neuborne led him to believe that some compensation for time spent on insurance claims would be forthcoming, such statements were clearly not binding on me. Nor could they have prejudiced Mr. Dubbin, who seems to think that he did me a favor by breaking out the lodestar attributable to his work on insurance releases from his "hybrid" fee request related to insurance and allocation issues.

Alternatively, Mr. Dubbin argues that Second Circuit law demands that he be compensated because I adopted his objection. He cites for this proposition *White v. Auerbach*, 500 F.2d 822 (2d Cir.1974), a case where the final settlement clearly "embodied alterations urged by appellants in their objections to the first proposal," but where the extent of the objections'

influence on the Judge was "simply not clear" because the judge who presided over the settlement had passed away. *Id.* at 822. This case is easily distinguished, of course, because I am perfectly able to remember what influence Mr. Dubbin's objections had on my decisions and because the amendment to the Settlement Agreement as it related to insurance companies did not "embod[y] alterations urged by" Mr. Dubbin. Indeed, the thrust of his complaints were that Swiss insurance companies cloaked assets or dealt in assets looted by the Nazis, a complaint that had nothing to do with the insurance companies' liability for unpaid policies addressed in the amendment to the Settlement Agreement. The amendment did not affect in any way the releases given to insurance companies as they related to looted or cloaked assets.

Still, Mr. Dubbin relies on the fact that in *Auerbach*, the Second Circuit indicated as follows:

> [T]he case is similar to *Green v. Transitron Electronic Corporation*, 326 F.2d 492, 498–499 (1st Cir.1964), wherein the district court had denied an allowance to an objector's counsel on the ground that the court was aware of the problem prior to the time when the objection was made. The Court of Appeals noted that at the time of the objection 'none of the court's misgivings were a matter of record,' and held that it was 'unfair to counsel when, seeking to protect his client's interest and guided by facts apparent on the record, he spends time and effort to prepare and advance an argument which is openly adopted by the court, but then receives no credit therefor because the court was thinking along that line all the while.' 326 F.2d at 499.

*Id.* at 829. Again, this case is wholly different. In *Green*, the objections were filed in a timely manner by someone working at the invitation of the court. 326 F.2d at 499. Here, Mr. Dubbin's objections were filed late and on a volunteer basis, and were not specifically adopted. As I explained, I asked Professor Neuborne to renegotiate the insurance releases because of a legal defect in the releases that Mr. Dubbin never raised, not because insurance companies had engaged in more nefarious activity than the parties initially believed. Specifically, as previously observed, it was apparent that the beneficiaries of insurance policies were not receiving any direct benefit for these insurance company releases and that there was not sufficient notice to potential claimants whose relatives may have had insurance policies in Swiss insurance companies. In other words, the beneficiaries of policies were giving up legal rights in exchange for no consideration and without adequate notice on that score. I do not contend that I was "thinking along that line all the while," but I was certainly "thinking along that line" by the time of Mr. Dubbin's late objection that did not even cite to these defects.

Even if I were to find that Mr. Dubbin's work contributed some material benefit to the amendment of the Settlement Agreement, I would not be able to accept his fee request. In May 2002, shortly after Mr. Dubbin filed his initial motion for fees, Robert Swift responded on behalf of the Plaintiffs Executive Committee. *See* Objection to the Verified Motion of Dubbin & Kravetz, LLP for Attorneys' Fees and Reimbursement of Expenses, dated May 13, 2002; Objection to the Verified Motion of Thomas Weiss, M.D. for Attorneys' Fees and Reimbursement of Expenses, dated May 31, 2002. Mr. Swift described Mr. Dubbin's fee request as "shocking," and his filing on behalf of Dr. Weiss as "surreal." *Id.* I agree. A brief examination of the break-down of Mr. Dubbin's time spent in the insurance releases aspect of this

case reveals how outlandish his request was. Mr. Dubbin has argued that "the law does not support the disaggregation of the attorneys' time when the firm's effort produced a material benefit for the class." Sept. 5, 2003, at 14 (citing *Dubin v. E.F. Hutton Group, Inc.*, 878 F.Supp. 616 (S.D.N.Y.1995)). Although I need not address the issue here because there was no "material benefit for the class," I do not I agree with the premise that "disaggregation of the attorneys' time" is inappropriate in the context of this fee application. Accordingly, I proceed to a "disaggregation" of Mr. Dubbin's time.

Again, Mr. Dubbin initially sought a lodestar award of $550,318, $95,000 in expenses, and a lodestar enhancement. Professor Neuborne broke down this request as follows:

> The lodestar, calculated on the basis of a $425 hourly fee that Mr. Dubbin claims to charge in general practice, includes $403,705 attributable to insurance issues at the trial level; $89,250 attributable to insurance aspects of the fairness and allocation appeals pursued by Mr. Dubbin; and $57,163 attributable to responses to objections filed to his materials during the summer of 2000 [though Mr. Dubbin claims that this was in fact for work done in 2002]. Of the $403,705 attributable to insurance issues, Mr. Dubbin estimates that $175,000 is attributable to pursuing the personal insurance claim of his client Dr. Thomas Weiss, against Generali.

Supplemental Neuborne Declaration, at 2. As Professor Neuborne argued, it is hard to see why the settlement class in this case should be asked to pay $175,000 for expenses in connection with Dr. Weiss's claim against Generali—an Italian insurance company not included in this case or released by the original Settlement Agreement—particularly because the vast bulk of any research was performed by Dr.

Weiss himself. Removing that sum reduced the original lodestar to $375,318. Similarly, it is incredible that Mr. Dubbin seeks fees related to his appeal, later withdrawn, from my judgment approving the Settlement Agreement. The ultimately withdrawn appeal, which I have already explained was nothing more than an attempted "hold-up" utilizing a challenge to a judgment that he now describes glowingly, accomplished nothing for insurance claimants. Professor Neuborne systematically addressed Mr. Dubbin's charges in connection with appeals, responses to objections in the summer of 2000, and "reconstructed time" for which Mr. Dubbin could not specifically account. *See* Supplemental Neuborne Declaration, at ¶¶ 3–5. The result is a swift reduction of Mr. Dubbin's lodestar to $129,455. I adopt this analysis without repeating it, and it would apply similarly to Mr. Dubbin's modified request. Indeed, Mr. Dubbin himself has now withdrawn his request for compensation for these three categories. *See* Modified Fee Request, at ¶ 4. The only place I differ with Professor Neuborne is in the final analysis. He argues that only 50% of this remaining lodestar reflected work that was necessary or could arguably have created a benefit. As I have explained, the more honest response is that none of Mr. Dubbin's work was necessary or had such an effect.

Part of Mr. Dubbin's rationale for his outlandish fee request is apparently his belief that, "Counsel's intervention on his Clients' behalf was indeed fraught with tremendous economic risk because it challenged the accepted wisdom of the elites of the class action bar, several major Jewish organizations, and the Governments of the United States and Switzerland." Fees Motion, at 11. But there was no great "risk" here. Mr. Dubbin relied on research that had been done by Dr. Weiss for a separate litigation and converted it

into a sloppy and untimely objection in this case. It is as if he had bought one raffle ticket and decided to enter it in a second drawing. That is not risky and does not warrant compensation.

All told, Mr. Dubbin had a hand in submitting two things relevant to the insurance releases in this case: Five minutes of redundant and irrelevant testimony at the fairness hearing, and a three-month-late objection to the Settlement Agreement. Neither of these actions required new research, shed new light on the issues in this lawsuit, or added anything to the work of Dr. Weiss, who no longer seeks a fee. In short, they were worthless.

## CONCLUSION

Mr. Dubbin's motion for attorney's fees is rejected. While he may have expended considerable time in connection with this case, that time was neither necessary nor helpful to the plaintiffs' class. More to the point, it does not deserve compensation from the settlement fund.

**SO ORDERED.**