In re HOLOCAUST VICTIM
ASSETS LITIGATION

Samuel J. Dubbin, Plaintiff–Appellant,

Pink Triangle Coalition, Karl Lange and Pierre Seel, Interested Parties–Cross–Appellants,

v.

Union Bank of Switzerland, Swiss Bank Corp., also known as Swiss National Bank, Banking Institutions #1–100, John Does #1–100, Certain Swiss Bank Accounts described as follows, Swiss Bankers Assoc., Swiss Bankers Association and Bank of International Settlements, Defendants–Appellees,

Plaintiffs' Executive Committee Settlement Class, Interested–Party–Appellee,

Judah Gribetz, Special Master,

Jacob Friedman, Estelle Sapir and Miriam Stern, on behalf of themselves and all other persons similarly situated, Plaintiffs,

World Jewish Restitution Organization, South Florida Holocaust Coalition and Thomas Weiss, Intervenor–Plaintiffs,

Washington State Insurance Commissioner, Gregory Tsvilichovsky, Matvey Yentus, Sofiya Bloshteyn, Olga Tsvilikhovskya, Larisa Ryabaya, Rosa Yentus, Pavel Aronov, Lubov Starodinskaya and Eliazar Bloshteyn, Interested–Parties,

Polish American Defense Committee, Inc., a non-profit California Corporation, Irving Wolf, Disability Rights Advocates and Director of International Affairs and Representative to the United Nations of Agudath Israel World Organization, Movants,

G.K., a Holocaust Survivor and member of the New American Jewish Club of Miami, L.K., a Holocaust Survivor and member of the New American Jewish Club of Miami, F.K., a Holocaust Survivor and member of the New American Jewish Club of Miami, Holocaust Survivors Foundation USA, Inc. (HSF), David Schaecter, individually and as President of the Holocaust Survivors Foundation–USA, Inc., Leo Rechter, individually and as President of the National Association of Jewish Holocaust Survivors (NAHOS), National Association of Jewish Holocaust Survivors (NAHOS), David Mermelstein, individually and as President of the New American Jewish Club of Miami and President of the South Florida Holocaust Survivors Coalition, New American Jewish Club of Miami, South Florida Holocaust Survivors Coalition, Alex Moskovic, individually and as President of the Child Survivors/Hidden Children of the Holocaust, Inc., Child Survivors/Hidden Children of the Holocaust, Esther Widman, individually as member of the National Association of Jewish Holocaust Survivors (NAHOS), Fred Taucher, individually and as President of the Survivors of the Holocaust Recovery Project (SHARP), Survivors of the Holocaust Recovery Project (SHARP), Nesse Godin, individually and as President of the Jewish Holocaust Survivors and Friends of Greater Washington, Jewish Holocaust Survivors and Friends of Greater Washington, Henry Schuster, individually and as President of the Holocaust Survivors Group of Southern Nevada, Holocaust Survivors Group of Southern Nevada, Herbert Karliner, individually and as a

member of the Holocaust Survivors Foundation–USA, Inc. and the South Florida Holocaust Survivors Coalition, Lea Weems, individually and as President of the Houston Council of Jewish Holocaust Survivors, Houston Council of Jewish Holocaust Survivors, Sam Gasson, individually and as President of the Habonim Cultural Club, Survivors of the Holocaust, Habonim Cultural Club, Survivors of the Holocaust, Holocaust Survivors of South Florida, Dena Axelrod, individually and as a member of the Child Survivors of the Holocaust, South Florida Group and the South Florida Holocaust Survivors Coalition, Saul Birnbaum, individually and as President of the Holocaust Survivors Club of Boca Raton (Century Village), Holocaust Survivors Club of Boca Raton (Century Village), Miriam Rubin, Individual Holocaust Survivor, Doris Fedrid, Individual Holocaust Survivor, Helga Gross, Individual Holocaust Survivor, National Federation of the Blind, USA, German Council of Centers for Self–Determined Lives, Finist, Russia, Equal Ability Limited, United Kingdom, Through the Looking Glass, USA, Disabled Persons International, Canada, World Institute on Disability, USA, Center for Independent Living, Bulgaria, Disability Rights Education and Defense Fund, US, Center for Independent Living, Berkeley, USA, California Foundation for Independent Living Center, Independent Living Resource Center, San Francisco, Computer Technologies Program, USA, Ragged Edge/Avocado Press, USA, Legal Advocacy for the Defense of People with Disabilities, National Confederation of Disabled Persons, Greece and De juRe Alapitvany, Hungary, Appellants.

Docket No. 04–1898–CV(L), 04–1899–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: May 16, 2005.

Decided: Sept. 9, 2005.

Edward Labaton, Goodkind Labaton Rudoff & Sucharow, LLP, New York, NY (Arthur J. England, Jr., Charles M. Auslander, and Brenda K. Supple, Greenberg Traurig, P.A., Miami, FL; Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL; Stephen Burbank, Philadelphia, PA, of counsel) for Appellants.

Burt Neuborne, New York, NY, and Robert A. Swift, Kohn Swift & Graf, PC, Philadelphia, PA (Melvyn I. Weiss, Deborah M. Sturman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Morris A. Ratner, Caryn Becker, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY) for Appellees.

Before: MESKILL, NEWMAN, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Samuel J. Dubbin appeals from a March 31, 2004 memorandum and order of the United States District Court for the Eastern District of New York (Edward R. Korman, *Chief Judge* ) denying his request for attorney's fees in connection with the settlement of the litigation styled as the Holocaust Victim Assets Litigation. *See In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d 363 (E.D.N.Y.2004). Dubbin's principal claim to attorney's fees rests on his purported contributions to an amendment to the settlement agreement that modified releases granted to Swiss insurance companies. In a comprehensive published opinion, the District Court analyzed, and ultimately rejected, Dubbin's fee request on the ground that his contributions were "late, tangential, and ultimately irrelevant." *Id.* at 378. We affirm.

## BACKGROUND

This appeal was consolidated with an appeal from the District Court's settlement allocation and distribution orders brought by, *inter alia,* Holocaust Survivors Foundation–U.S.A., Inc. ("HSF"), an entity represented by Dubbin. We adjudicate the HSF's appeal in a separate opinion, *In re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir.2005), which summarizes the claims underlying the Holocaust Victim Assets Litigation and its procedural history. We assume familiarity with that summary and highlight here only those background events directly relevant to this appeal.

The settlement agreement signed by the parties on January 26, 1999 would have had the effect of releasing Swiss insurance companies (with three specific exceptions) from liability for certain Holocaust-related claims. *In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 365. On May 10, 1999, the District Court set an October 22, 1999 deadline for comments on the settlement agreement. *In re Holocaust Victim Assets Litig.*, No. 96–4849, slip op. at 4 (E.D.N.Y. May 10, 1999) (scheduling order). Only one of the 200 timely submissions specifically addressed the insurance releases—an October 20, 1999 objection by Washington State Insurance Commissioner Deborah Senn. Commissioner Senn principally argued that

> [t]he proposed settlement is unfair to insurance policyholders and beneficiaries. It releases all claims against all Swiss insurers and reinsurers [with three exceptions]. There has been no public review of their records to determine their unpaid Holocaust policies or their value. These companies may be released from many millions of dollars of wrongfully unpaid claims in exchange for relatively *de minimis* payments to policyholders or their heirs. Class members are required to decide whether to opt out of the class without even being told whether they or a family member were covered by policies or the face amount of such policies, although this information may be in the possession of the settling companies. The proposed settlement undermines the International Commission on Holocaust Era Insurance Claims ["ICHEIC"] whose protocols provide for identification, valuation and payment of policies.

Commissioner Senn's concerns were echoed in a November 18, 1999 letter by Lawrence S. Eagleburger, the Chairman of the ICHEIC and former U.S. Secretary of State.

Only on November 24, 1999—more than a month after the deadline for objections, and well after the District Court had received the submissions of Commissioner Senn and Secretary Eagleburger—did Thomas Weiss, who was then represented by Dubbin, send a letter to the Court regarding the insurance company releases. This letter reads, in its entirety:

Dear Judge Korman,

It was brought to my attention that the Swiss bank settlement of $1.25 billion releases the Swiss insurance companies [with three exceptions] from any further liability. This is completely unacceptable, as many Swiss insurance companies acted as cloaking agents for Munich [Reinsurance] of Germany during WWII. U.S. military and intelligence/legal documents from 1944–47 state this explicitly and charge Munich [Reinsurance] with criminal activity. Additionally, this surreptitious inclusion of these companies is not known to the general survivor community. Your assistance to remove this inappropriate blanket amnesty for the Swiss insurance industry is vital.

The Bergier[ ] report states that the amount that the Swiss owe regarding stolen WWII gold may exceed six billion dollars. The documents further state that although the Swiss banking industry stopped receiving gold at a point before the end of the war (as a result of Treasury Secretary Henry Morganthau's admonition that there will be a day of reckoning) the Swiss insurance industry continued receiving stolen gold up to the last days of the war. Justice demands that the Swiss insurance industry not escape its responsibility.

Sincerely,

[signed]

Thomas Weiss, MD

Dubbin made substantially the same points in an oral statement during a November 29, 1999 fairness hearing before the District Court. In the main, he cautioned the Court against "a blanket release of unnamed and unidentified companies, which we know from evidence in the archives may well have been beneficiaries of looted Jewish assets through the access in Nazi insurance trusts, without being even identified or held to account in any way, shape or form for what their responsibilities are." Dubbin added:

I know that Commissioner [Senn] in the State of Washington and Chairman [Eagleburger] have brought this question to the Court's attention. But particularly in light of some of the documents we have found, we felt on behalf of the Florida survivor community and Dr. Weiss in particular, we would urge you—and I know [the Lead Settlement Counsel, Professor Burt] Neuborne said if we have any problems with the settlement, please bring them to his attention.

I don't know what benefit accrues to survivors from what may be a big surprise at the end of the road, when we find out some of the companies not even identified today being released could well be as culpable as some of the ones who we've been talking about all these years. Thank you very much.

In a December 22, 1999 conference that followed the fairness hearings, the District Court instructed the Lead Settlement Counsel to renegotiate the releases of Swiss insurance companies. *In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 370.

On January 31, 2000, approximately six weeks after the Lead Settlement Counsel received this charge from the District Court (and three months after the deadline for comments on the original settlement agreement), Dubbin filed a written objec-tion to the settlement agreement. The objection principally criticized the "broad inclusion of Swiss insurers, and, thereby, claims for unpaid insurance policies under the umbrella of this litigation."

In May 2000, the parties to the class action agreed to amend the settlement agreement in a manner that addressed the District Court's concerns regarding the insurance company releases. *In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 373. The amended settlement agreement designated an amount of up to $100 million—including up to $50 million provided by the insurance companies—for the resolution of unpaid insurance claims. *Id.* at 373–74. In a memorandum and order dated July 26, 2000, the District Court approved the amended settlement agreement. *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 160 (E.D.N.Y. 2000). Its final order approving the agreement was entered August 9, 2000.

Dubbin subsequently informed the District Court of his intention to appeal, on behalf of Weiss, the approval of the amended settlement agreement. *See In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 374–75. The Court met with Dubbin and Weiss to discuss their concerns, and it subsequently described what transpired:

After the discussion appeared to be going nowhere, Dr. Weiss asked how much I would pay to prevent them from filing a notice of appeal. Specifically, he wanted me to provide attorneys fees and funds for private research that would assist him in his litigation against [the Italian insurance firm] Generali. This was beyond the pale. I was not going to be blackmailed, particularly with funds that belong to Holocaust survivors.

*Id.* at 375. Dubbin then filed a notice of appeal on Weiss's behalf, but eventually withdrew it without filing a brief. Other

parties, however, appealed from the District Court's order approving the amended settlement agreement. We affirmed. *See In re Holocaust Victim Assets Litig.*, 413 F.3d 183 (2d Cir.2001).

Dubbin then submitted a fee application seeking a total of $5.9 million—$3.6 million for himself and approximately $2.3 million for Weiss. *See In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 364 (quoting *In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d 89, 116–17 (E.D.N.Y.2004)). This request was "'almost equal to the total amount of legal fees awarded to those counsel who were compensated for their role in obtaining the *$1.25 billion* settlement with the Swiss banks.'" *Id.* (emphasis added). Of the total fees requested, $2.9 million ($600,000 for Dubbin and $2.3 million for Weiss) was sought in connection with the amended releases of Swiss insurance companies. *See id.* After the District Court first addressed the merits of these requests on March 9, 2004, *see In re Holocaust Victim Assets Litig.*, 302 F.Supp.2d at 118, the amount of these requests "substantially diminished." *In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 364. Indeed, Weiss withdrew his request entirely. *Id.* Dubbin decreased his request multiple times, eventually seeking fees of $309,051 and expenses of $41,318. *Id.*

In a memorandum and order dated March 31, 2004, the District Court denied Dubbin's fee request in its entirety. *Id.* In the course of doing so, the Court provided a detailed factual account of the chain of events that precipitated its request for a renegotiation of insurance releases. It underscored, first, the significance of the objections raised by Commissioner Senn and Secretary Eagleburger. *Id.* Although "the thrust of the Senn and Eagleburger objections was on maintaining the ongoing viability of ICHEIC—something not ulti-mately relevant to the decision to amend the Settlement Agreement"—these objections "caused [the Court] to focus on the validity of the insurance releases." *Id.* Importantly, the District Court found that its attention had been drawn to the insurance releases *before* it received Weiss's November 24, 1999 letter. *Id.*

Once Weiss's letter arrived—over a month after the deadline for submitting formal objections—the District Court summarized its significance as follows:

> The letter itself stated little more than a general notion that the insurance companies had done wrong and that releasing them was therefore inappropriate. More to the point, the letter did not address the actual defect in the insurance releases, focusing instead on the extent to which Swiss insurance companies engaged in cloaking assets. Whether a company cloaked—that is, hid—assets on behalf of the Nazis is wholly irrelevant to a claimant who is seeking to recover from an insurance company for a policy once held by a victim of Nazi persecution.

*Id.* at 368.

The District Court further found that Dubbin's statement at the November 29, 1999 fairness hearing merely "elaborate[d] on the letter his client had sent [the Court] a week earlier ... and added nothing to the legal arguments that Commissioner Senn had already advanced in a timely fashion." *Id.* at 369.

Following the fairness hearing, the District Court took the following actions:

> [C]oncerns that had been brewing led [the Court] to call a conference with the parties. After the parties had a time to prepare, [the Court] held a conference on December 22, 1999, some three weeks after the fairness hearing. One of the purposes of the meeting, as recorded by Deputy Special Master Shari

Reig, was to "discuss[ ] the two key issues that Judge Korman has made it clear he wants to resolve prior to ruling on the fairness of the settlement—art and insurance." In the end, [the Court] insisted that the insurance releases be renegotiated not because Swiss insurance companies had cloaked assets or engaged in other wrongdoing unrelated to avoiding payment of insurance policies issued to victims of Nazi persecution. Rather, [the Court] was concerned with the straightforward legal point that, as originally drafted, the insurance releases were unenforceable because Swiss insurance companies were released from claims by beneficiaries or heirs who were not receiving any direct and distinct benefit for these releases. In addition, these potential claimants were not adequately informed that their claims were being released....

. . .

By the time of the December 22, 1999 meeting, [the Court] had become convinced that the insurance releases were unenforceable as drafted. Indeed, when [the Court] eventually approved the amended settlement, [the Court] wrote: "[I]f the carriers do not reaffirm [the amended insurance releases], I will issue a supplemental decision on the enforceability of the original insurance releases." [The Court] was prepared to hold them unenforceable as violating the consideration requirement of [*National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir.1981) ]. This legal defect is why [the Court] asked Professor Neuborne to reenter negotiations. It had nothing to do with the five minutes of testimony Mr. Dubbin had presented at the fairness hearing. If any submission is to be credited for opening this reconsideration, it is that of Commissioner Senn, who in a *timely fashion* pointed out that there

was a problem with the "*de minimis* " return class members were going to receive from the insurance releases and the general insufficiency of the notice. *Id.* at 370–71 (citations omitted) (emphasis in original).

The Court then summarized Dubbin's contributions to the settlement agreement as follows:

First, he submitted nothing prior to the deadline for written objections to the Settlement Agreement and nothing prior to the fairness hearing. Second, Mr. Dubbin spoke briefly at the fairness hearing repeating the sentiments and research of his client, expressing his approval of objections that had been filed in a timely matter by other individuals, and adding his concern that many Swiss insurance companies engaged in cloaking assets. Third, Mr. Dubbin filed a largely irrelevant written objection based on research by his client three months late and six weeks after [the Court] had decided that the insurance releases were unenforceable. Fourth, Mr. Dubbin stood by as his client attempted to extort a significant cash award from a fund belonging to Holocaust survivors in exchange for not filing a notice of appeal from [the Court's] judgment approving the fairness of the settlement. And fifth, Mr. Dubbin filed that notice of appeal. For this, he initially sought $600,000, and now seeks $309,051 in fees plus $41,318 in disbursements.

*Id.* at 375. The District Court found these contributions "worthless," and denied Dubbin's fee request. *Id.* at 382.

Dubbin now appeals from this decision.

### DISCUSSION

■ Under the "common fund doctrine," a party that secured "a fund for the

benefit of others, in addition to himself, may recover his costs, including his attorney's fees, from the fund itself or directly from the other parties enjoying the benefit." *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir.1996). The actions of the party seeking to recover costs must, however, be "a substantial cause of the benefit obtained." *Id.* at 57. Dubbin agrees, as he must, that "a material benefit to the class is the *sine qua non* for an attorney's entitlement to an award of fees from the common fund." Appellant's Br. at 30. The District Court concluded that Dubbin's contributions failed to offer any material benefit to the class. We agree.

We review the District Court's denial of attorney's fees for an abuse of discretion. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47–48 (2d Cir.2000). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).

It merits underscoring that " 'abuse of discretion'—already one of the most deferential standards of review—takes on special significance when reviewing fee decisions." *Goldberger*, 209 F.3d at 47. "[T]he district court, which is intimately familiar with the nuances of the case, is in a far better position to make [such] decisions than is an appellate court, which must work from a cold record." *In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir.1992).

Upon careful review of the record of this case, we conclude that the District Court acted well within its discretion in finding (1) that the renegotiation of the Swiss insurance company releases was initiated well before Dubbin submitted his formal objection on January 31, 2000; (2) that the decision to renegotiate these releases was triggered by the Senn and Eagleburger objections, rather than by Weiss's November 24, 1999 letter or by Dubbin's November 29, 1999 statement at the fairness hearing; and (3) that, in any event, "the amendment to the Settlement Agreement as it related to insurance companies did not embody alterations urged by Mr. Dubbin." *In re Holocaust Victim Assets Litig.*, 311 F.Supp.2d at 380 (alterations omitted). We thus find no support for Dubbin's contention that his participation substantially contributed to the insurance-related amendments to the settlement agreement.

In his appellate brief, Dubbin retreats to the position that even counsel who have not increased "the monetary value of a settlement" may nonetheless receive attorney's fees if "they sharpen the focus of settlement issues and provide important insights shaping the settlement." Appellant's Br. at 31. Assuming *arguendo* that this position is accurate as a matter of law, nothing in the record of this case or in the findings of the District Court indicates that Dubbin's contribution has crossed even this reduced threshold.

Dubbin further claims that he is entitled to attorney's fees on the basis of his January 31, 2000 written objection to the original settlement agreement despite the fact that the District Court had requested amendments to that agreement six weeks *before* Dubbin's submission was filed. Relying on two decisions—*White v. Auerbach*, 500 F.2d 822 (2d Cir.1974), and *Green v. Transitron Electronic Corp.*, 326 F.2d 492 (1st Cir.1964)—Dubbin asserts that he is entitled to compensation because

the District Court's intention to pursue the amendment was not "revealed" until after he filed his January 2000 objection. Appellant's Br. at 39.

The cases on which Dubbin relies are inapplicable here. In *White,* we emphasized that "[o]rdinarily the trial judge has broad discretion in deciding whether, and in what amount, attorneys' fees should be awarded, since he is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery." 500 F.2d at 828. In that case, however, we faced "an unusual situation in that the district judge who passed on the applications for attorneys' fees did not preside over the proceedings which formed the basis for the applications," because the judge who presided over the latter proceedings had died. *Id.* at 826. Here, by contrast, Chief Judge Korman presided over both the settlement and the fee application, and his assessments of Dubbin's contributions should therefore be accorded deference.

In *Green,* the First Circuit held that it is "unfair to counsel when, seeking to protect his client's interest and guided by facts apparent on the record, he spends time and effort to prepare and advance an argument which is ultimately adopted by the court, but then receives no credit therefor because the court was thinking along that line all the while." 326 F.2d at 499. There are, however, at least three salient differences between Dubbin's fee application and that of the attorneys in *Green:* (1) unlike Dubbin, those attorneys were "not [ ] volunteer[s] but came in at the invitation of the court," *id.*; (2) Dubbin's legal argument was not, in fact, "adopted by the court"; and (3) Dubbin could hardly have had a reasonable expectations that the labor he invested into his substantive filing would be compensated once he had missed the Court's deadline by three months.

CONCLUSION

We have carefully considered all of Dubbin's arguments and we find each of them to be without merit. Accordingly, the District Court's memorandum and order of March 31, 2004 is hereby affirmed.